UNITED STATES of America, Plaintiff-Appellee,

v.

ASHLAND OIL AND TRANSPORTATION CO., a subsidiary of Ashland Oil Co., Inc., Defendant-Appellant.

No. 73-2161.

United States Court of Appeals, Sixth Circuit.

Nov. 1, 1974.

Ralph W. Wible, Owensboro, Ky., for defendants-appellants.

A. Duane Schwartz, George Long, Asst. U. S. Attys., Louisville, Ky., James Lawrence Zimmerman, John Vance Hughes, E.P.A.—Region 4, Atlanta, Ga., Wallace H. Johnson, Edmund B. Clark, Carl Strass, Dept. of Justice, Appellate Section, Land and Natural Resources Div., Washington, D.C., for plaintiff-appellee.

Before WEICK, EDWARDS and CELEBREZZE, Circuit Judges.

EDWARDS, Circuit Judge.

This case poses three questions of vital importance to protection of the water resources of these United States:

1) Did Congress in adopting the Federal Water Pollution Control Act Amendments of 1972 [1] intend to control both discharges of pollutants directly into navigable waters and discharges of pollutants into nonnavigable tributaries which flowed into navigable rivers? We answer this question "yes."

[1]. 33 U.S.C. §§ 1251–1376 (1972).

2) Does Congress have constitutional authority under its interstate commerce powers to prohibit discharge of pollutants into nonnavigable tributaries of navigable streams? We answer this question "yes."

3) Assuming the affirmative answers set forth above, under the Federal Water Pollution Control Act is the government required to bear the burden of proof to establish not only that (as here) pollutants were discharged into a nonnavigable tributary of a navigable river, but that in fact these same pollutants reached and polluted the navigable river? We answer this question "no."

Defendant-appellant Ashland Oil was indicted for failing "immediately" to report the discharge of 3,200 gallons of oil into the water of Little Cypress Creek on February 20, 1973. The indictment alleged violation of 33 U.S.C. § 1321(b)(5) of the Federal Water Pollution Control Act Amendments of 1972. The statutory provisions directly concerned are:

"(5) Any person in charge of a vessel or of an onshore facility or an offshore facility shall, as soon as he has knowledge of any discharge of oil or a hazardous substance from such vessel or facility in violation of paragraph (3) of this subsection, immediately notify the appropriate agency of the United States Government of such discharge. Any such person who fails to notify immediately such agency of such discharge shall, upon conviction, be fined not more than $10,000, or imprisoned for not more than one year, or both. Notification received pursuant to this paragraph or information obtained by the exploitation of such notification shall not be used against any such person in any criminal case, except a prosecution for perjury or for giving a false statement." 33 U.S.C. § 1321 (b)(5) (1972).

"(3) The discharge of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone in harmful quantities as determined by the President under paragraph (4) of this subsection, is prohibited, except (A) in the case of such discharges of oil into the waters of the contiguous zone, where permitted under article IV of the International Convention for the Prevention of Pollution of the Sea by Oil, 1954, as amended, and (B) where permitted in quantities and at times and locations or under such circumstances or conditions as the President may, by regulation, determine not to be harmful. Any regulations issued under this subsection shall be consistent with maritime safety and with marine and navigation laws and regulations and applicable water quality standards." 33 U.S.C. § 1321(b)(3) (1972).

The case was tried before Judge James Gordon in the United States District Court for the Western District of Kentucky. Ashland Oil was found guilty and on recommendation of the United States Attorney was fined $500.

On appeal Ashland claims that Congress does not have the constitutional power to control pollution of nonnavigable tributaries of navigable streams and has not sought to do so in the statutes quoted above, that these statutes being criminal in nature should be strictly construed against the government, that Little Cypress Creek was nonnavigable in fact, that the discharge never reached "navigable waters," and that anyway it (Ashland) did report the oil discharge "immediately."

The case was tried chiefly on an extensive stipulation of facts:

"STIPULATION—Filed September 20, 1973

Now comes the parties, by counsel, and stipulate as follows:

1. Ashland Oil and Transportation Company, a subsidiary of Ashland Oil Incorporated was a person in

charge of the pipeline which discharged crude oil.

2. The Ashland Oil and Transportation Company pipeline from which the discharge occurred is located on and under land within the Western District of Kentucky, in Muhlenburg County, Kentucky.

3. The oil discharged directly into the waters of a small tributary to Little Cypress Creek at a point approximately 100 feet from the tributary's confluence with Little Cypress Creek.

4. Ashland Oil and Transportation Company had certain knowledge of the exact location and origin of the spill by 7:00 p. m., February 20, 1973.

5. Ashland Oil and Transportation Company reported the spill to the United States Environmental Protection Agency in Atlanta through Mr. A. D. Headley, its employee, at 10:10 a. m., February 21, 1973.

6. Ashland Oil and Transportation Company discharge approximately 3200 gallons of crude oil which created a visible sheen on Little Cypress Creek before 7:00 p. m., February 20, 1973.

7. The Green River is navigable in fact at the point that Pond River empties into it.

8. That Cypress Creek is a tributary to Pond River and Pond River is a tributary to Green River.

9. Little Cypress Creek is a tributary to Cypress Creek.

10. Illinois Central Railroad and Peabody Coal Company both are engaged in interstate commerce and both discharge into Little Cypress Creek.

11. The Central City Kentucky Sewage Treatment Plant treats the waste coming from several motels and restaurants which are engaged in interstate commerce, and it discharges into Little Cypress Creek.

12. A portion of the Western Kentucky Parkway, a four lane toll road and major highway for interstate commerce running east and west through the State of Kentucky, is drained by Little Cypress Creek.

13. The Little Cypress Creek drains many farms through which it flows. These farms use equipment and materials which are received through interstate commerce, and their products affect interstate commerce.

14. The Little Cypress Creek drains the area in which Ashland Oil and Transportation Company facilities are located.

15. While the defendant does not stipulate in any way that it degraded the quality of the water of Little Cypress Creek, the parties do stipulate that the quality of the water in Little Cypress Creek affects the produce of the farms that it drains and to which it supplies water.

16. Ashland Oil and Transportation Company was aware on February 20, 1973 that the U. S. Environment Protection Agency and U. S. Coast Guard each maintains 24 hour telephone services for receiving reports of oil and hazardous material spills."

As noted above in the stipulation, Little Cypress Creek is a tributary to Cypress Creek, which is a tributary to Pond River, which is a tributary to Green River. The stipulation indicates that of these, only Green River is actually a navigable river "in fact" in terms of waterborne commerce.

## I    Interpretation of the Act

The Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 through 1376, was first enacted in 1948. It was amended many times until it was substantially revised and reenacted in 1972. It is this statute which contains the two enforcement paragraphs, previously quoted, upon which the prosecution of this case depends. We do not, however, believe that § 1321(b)(3) and (5) can properly be interpreted without reference to the whole of the Congressional scheme of which they are merely a small, if important, part. To understand Con-

gress' purposes, we need to refer to the national goals and policies which Congress adopted:

"(a) The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter—

(1) it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985;

(2) it is the national goal that wherever attainable, an interim goal of water quality which provides for the protection and propagation of fish, shellfish, and wildlife and provides for recreation in and on the water be achieved by July 1, 1983;

(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

(4) it is the national policy that Federal financial assistance be provided to construct publicly owned waste treatment works;

(5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State; and

(6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, waters of the contiguous zone, and the oceans." 33 U.S.C. § 1251(a)(1–6) (1972).

Since the term "navigable waters" is employed in the first stated national goal, it is important at the outset to quote the definition of that term which was added by the 1972 Amendments and is applicable to the whole chapter:

"Except as otherwise specifically provided, when used in this [chapter]:

\* \* \* \* \* \*

(7) The term 'navigable waters' means the waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7) (1972).

In the same definition section, the term "pollution" is defined:

"(19) The term 'pollution' means the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." 33 U.S.C. § 1362(19) (1972).

The intention of Congress to eliminate or drastically reduce water pollution throughout the waters of the United States is made clear in many provisions of the Act, of which the following are only a sample:

"(a) The Administrator shall, after careful investigation, and in cooperation with other Federal agencies, State water pollution control agencies, interstate agencies, and the municipalities and industries involved, prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the navigable waters and ground waters and improving the sanitary condition of surface and underground waters. In the development of such comprehensive programs due regard shall be given to the improvements which are necessary to conserve such waters for the protection and propogation of fish and aquatic life and wildlife, recreational purposes, and the withdrawal of such waters for public water supply, agricultural, industrial, and other purposes. For the purpose of this section, the Administrator is authorized to make joint investigations with any such agencies of the condition of any waters in any State or States, and of the discharges of any sewage, industrial wastes, or substance which may adversely affect such waters.

\* \* \* \* \* \*

"(c)(1) The Administrator shall, at the request of the Governor of a State, or a majority of the Governors when more than one State is involved, make a grant to pay not to exceed 50 per

centum of the administrative expenses of a planning agency for a period not to exceed three years, which period shall begin after October 18, 1972, if such agency provides for adequate representation of appropriate State, interstate, local, or (when appropriate) international interests in the basin or portion thereof involved and is capable of developing an effective, comprehensive water quality control plan for a basin or portion thereof.

\* \* \* \* \* \*

"(3) For the purposes of this subsection the term 'basin' includes, but is not limited to, rivers and their tributaries, streams, coastal waters, sounds, estuaries, bays, lakes, and portions thereof, as well as the lands drained thereby." 33 U.S.C. § 1252(a), (c) (1), (3) (1972).

"(a) The Administrator shall establish national programs for the prevention, reduction, and elimination of pollution and as part of such programs shall—

\* \* \* \* \* \*

"(5) in cooperation with the States, and their political subdivisions, and other Federal agencies establish, equip, and maintain a water quality surveillance system for the purpose of monitoring the quality of the navigable waters and ground waters and the contiguous zone and the oceans and the Administrator shall, to the extent practicable, conduct such surveillance by utilizing the resources of the National Aeronautics and Space Administration, the National Oceanic and Atmospheric Administration, the Geological Survey, and the Coast Guard, and shall report on such quality in the report required under subsection (a) of section 1375 of this title;

\* \* \* \* \* \*

"(i) The Administrator, in cooperation with the Secretary of the department in which the Coast Guard is operating, shall—

(1) engage in such research, studies, experiments, and demonstrations as he deems appropriate, relative to the removal of oil from any waters and to the prevention, control, and elimination of oil and hazardous substances pollution; . . . ." 33 U.S.C. § 1254(a)(5), (i)(1) (1972).

Other Congressional concerns with water pollution which extend far beyond waters which are navigable in fact are § 1254(n), dealing with studies of the effects of pollution upon estuaries and estuarial zones, § 1254(p), agricultural pollution, § 1254(q), studies of sewage in rural areas, and § 1255(b), demonstration projects for control of pollution in river basins.

Important definitions include:

"(a) For the purpose of this section, the term—

(1) 'oil' means oil of any kind or in any form, including, but not limited to, petroleum, fuel oil, sludge, oil refuse, and oil mixed with wastes other than dredged spoil;

\* \* \* \* \* \*

(5) 'United States' means the States, the District of Columbia, the Commonwealth of Puerto Rico, the Canal Zone, Guam, American Samoa, the Virgin Islands, and the Trust Territory of the Pacific Islands;

\* \* \* \* \* \*

(8) 'remove' or 'removal' refers to removal of the oil or hazardous substances from the water and shorelines or the taking of such other actions as may be necessary to minimize or mitigate damage to the public health or welfare, including, but not limited to, fish, shellfish, wildlife, and public and private property, shorelines, and beaches;

\* \* \* \* \* \*

(10) 'onshore facility' means any facility (including, but not limited to, motor vehicles and rolling stock) of any kind located in, on, or under, any land within the United States other than submerged land; \* \* \* \*"

33 U.S.C. § 1321(a)(1), (5), (8), (10) (1972).

Section 1321(b)(1) provides:

"The Congress hereby declares that it is the policy of the United States that there should be no discharges of oil or hazardous substances into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone."

Section 1321(c)(1) provides:

"Whenever any oil or a hazardous substance is discharged, into or upon the navigable waters of the United States, adjoining shorelines, or into or upon the waters of the contiguous zone, the President is authorized to act to remove or arrange for the removal of such oil substance at any time, unless he determines such removal will be done properly by the owner or operator of the vessel, on-shore facility, or offshore facility from which the discharge occurs."

Section 1321(e) provides:

"In addition to any other action taken by a State or local government, when the President determines there is an imminent and substantial threat to the public health or welfare of the United States, including, but not limited to, fish, shellfish, and wildlife and public and private property, shorelines, and beaches within the United States, because of an actual or threatened discharge of oil or hazardous substances into or upon the navigable waters of the United States from an onshore or offshore facility, the President may require the United States attorney of the district in which the threat occurs to secure such relief as may be necessary to abate such threat, and the district courts of the United States shall have jurisdiction to grant such relief as the public interest and the equities of the case may require." 33 U.S.C. § 1321(b)(1), (c)(1), (e) (1972).

We have indulged this much quotation from the statutory language in order to make the point that Congress' clear intention as revealed in the Act itself was to effect marked improvement in the quality of the total water resources of the United States, regardless of whether that water was at the point of pollution a part of a navigable stream.

We believe Congressional intent was accurately portrayed by Representative Dingell, one of the active supporters of S. 2770:

"Several of the provisions of the conference report deserve special mention in aid of explaining the intent of Congress with regard to the administration and enforcement of the revised Federal Water Pollution Control Act. Also, there are several provisions which give me special concern.

*   *   *   *   *   *

"Third, the conference bill defines the term 'navigable waters' broadly for water quality purposes. It means all 'the waters of the United States' in a geographical sense. It does not mean 'navigable waters of the United States' in the technical sense as we sometimes see in some laws.

"The new and broader definition is in line with more recent judicial opinions which have substantially expanded that limited view of navigability— derived from the Daniel Ball case (77 U.S. 557, 563 [10 Wall. 557, 19 L.Ed. 999])—to include waterways which would be 'susceptible of being used *   *   * with reasonable improvement,' as well as those waterways which include sections presently obstructed by falls, rapids, sand bars, currents, floating debris, et cetera.

"The U. S. Constitution contains no mention of navigable waters. The authority of Congress over navigable waters is based on the Constitution's grant to Congress of 'Power *   *   * To regulate commerce with Foreign Nations and among the several States *   *   *' (art. I, sec. 8, clause 3). Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1 [6 L.Ed. 23] (1824). Although most interstate commerce 150 years ago was accomplished on waterways, there is

no requirement in the Constitution that the waterway must cross a State boundary in order to be within the interstate commerce power of the Federal Government. Rather, it is enough that the waterway serves as a link in the chain of commerce among the States as it flows in the various channels of transportation—highways, railroads, air traffic, radio and postal communication, waterways, et cetera. The 'gist of the Federal test' is the waterway's use 'as a highway,' not whether it is 'part of a navigable interstate or international commercial highway.' Utah v. United States, 403 U.S. 9, 11 [91 S.Ct. 1775, 29 L.Ed.2d 279] (1971); U. S. v. Underwood, 4 ERC 1305, 1309 [344 F.Supp. 486] (D.C., Md., Fla., Tampa Div., June 8, 1972).

"Thus, this new definition clearly encompasses all water bodies, including main streams and their tributaries, for water quality purposes. No longer are the old, narrow definitions of navigability, as determined by the Corps of Engineers, going to govern matters covered by this bill. Indeed, the conference report states on page 144:

'The conferees fully intend that the term navigable waters be given the broadest possible constitutional interpretation unencumbered by agency determinations which have been made or may be made for administrative purposes.' " 118 Cong.Rec. 33756–57 (1972).

With the broad sweep of the Act in our minds and with this specific legislative interpretation by one of the House floor managers of the bill, we turn directly to the problems of statutory interpretation posed by this case. Appellant claims that the two paragraphs of Section 311 of the Act (33 U.S.C. § 1321

(b)(3), (5)) which are directly involved in this prosecution (*See* page 1319, *supra*) apply only to "navigable waters of the United States" in the classical meaning accorded them in 1871 in the case of The Daniel Ball, 77 U.S. (10 Wall.) 557, 19 L.Ed. 999 (1871).[2]

Judge Gordon responded to this argument:

"In form of a motion to dismiss, defendant contended that Section 311 of the Act applies only to the classical 'navigable waters of the United States,' and, therefore, does not provide jurisdiction over discharges into 'waters of the United States' as alleged in the information. That motion is denied.

"To determine the clear meaning of the questioned criminal provision, one need go no further than the definitions provided in the Act. Congress defined 'navigable waters' as 'waters of the United States.' [33 U.S.C. § 1362 (7)]. To determine whether an oil discharge has entered waters regulated by Section 311 of the Act, a citizen simply inserts the statutory definition in place of the term 'navigable waters.' That navigable waters is sometimes followed by a prepositional phrase does not alter this obvious result except perhaps to emphasize the inclusion of the waters of all the geographic areas listed in the definition of 'United States.' [Section 311(5) of the Act; 33 U.S.C. Section 1321(5)]. Thus, it is unnecessary to rely on the government's supplemental argument that well established judicial philosophy 'forbids a narrow, cramped reading' of pollution legislation. United States v. Standard Oil Co., 384 U.S. 224, 226 [86 S.Ct. 1427, 16 L.Ed.2d 492] (1966); United States v. Republic Steel Corp., 362 U.S. 482, 491 [80 S.Ct. 884, 4 L.Ed.2d 903] (1960)."

---

**2.** Both parties call our attention to Hardy Salt Co. v. Southern Pacific Transportation Co., 501 F.2d 1156 (10th Cir. 1974). Appellant claims it supports the continuing vitality of the definition of "navigable waters of the United States" contained in *The Daniel Ball*,

*supra. Hardy Salt*, however, concerns the Rivers and Harbors Act of 1899 but has no application to the Federal Water Pollution Control Act Amendments of 1972 and reaches no question of constitutional power.

As Judge Gordon recognized, Congress in 1972 adopted a new definition of the term "navigable waters" for purposes of the Federal Water Pollution Control Act. The definition was added at a most meaningful point in Congress' consideration of the Act by the Joint House Senate Conference Committee. It was placed in the general definition section, 33 U.S.C. § 1362(7) (1972), following the words "Except as otherwise specifically provided, when used in this [chapter]:" The definition reads "(7) The term 'navigable waters' means the waters of the United States, including the territorial seas."

■ Like the District Judge, we believe Congress knew exactly what it was doing and that it intended the Federal Water Pollution Control Act to apply, as Congressman Dingell put it, "to all water bodies, including main streams and their tributaries." Certainly the Congressional language must be read to apply to our instant case involving pollution of one of the tributaries of a navigable river. Any other reading would violate the specific language of the definition just quoted and turn a great legislative enactment into a meaningless jumble of words.

## II   The Constitutional Power

■ Whatever Congress may have intended, its enactments to be valid must be within its legislative authority under the Constitution of the United States. Our forefathers in writing the Constitution could have had no concept of the water pollution problems of today. But they had a specific concept of the importance of interstate commerce and specifically gave Congress power to regulate it:

"The   Congress   shall   have   Power
.   .   .

   To  regulate  Commerce   .   .   .
among  the  several  States.   .   .   ."
U.S.Const. art. I, § 8, cl. 3.

Likewise, the authors of the Constitution provided Congress broad legislative authority to pass laws concerning future unknown problems which might affect the health and welfare of the nation:

"All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of ·Representatives." U.S.Const. art. I, § 1.

"The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States; . . .

"To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof." U.S.Const. art. I, § 8.

*See* Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); Helvering v. Davis, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed. 274 (1945).

We believe that the language of the Federal Water Pollution Control Act and its legislative history show that the United States Congress was convinced that uncontrolled pollution of the nation's waterways is a threat to the health and welfare of the country, as well as a threat to its interstate commerce.

Obviously water pollution is a health threat to the water supply of the nation. It endangers our agriculture by rendering water unfit for irrigation. It can end the public use and enjoyment of our magnificent rivers and lakes for fishing, for boating, and for swimming. These health and welfare concerns are, of course, proper subjects for Congressional attention because of their many impacts upon interstate commerce generally. But water pollution is also a direct threat to navigation—the first interstate

commerce system in this country's history and still a very important one.

Some years ago the United States Supreme Court supplied a dramatic illustration of this last problem:

"The seaman lost his life on the tug *Arthur N. Herron,* which, on the night of November 18, 1952, while towing a scow on the Schuylkill River in Philadelphia, caught fire when an open-flame kerosene lamp on the deck of the scow ignited highly flammable vapors lying above an extensive accumulation of petroleum products spread over the surface of the river. Several oil refineries and facilities for oil storage, and for loading and unloading petroleum products, are located along the banks of the Schuylkill River. The trial court found that the lamp was not more than three feet above the water." Kernan v. American Dredging Co., 355 U.S. 426, 427, 78 S.Ct. 394, 395, 2 L.Ed.2d 382 (1958).

We also know (and we take judicial notice) that two of the important rivers of this circuit, the Rouge River in Dearborn, Michigan, and the Cuyahoga River in Cleveland, Ohio, reached a point of pollution by flammable materials in the last ten years that they repeatedly caught fire. Such pollution is an obvious hazard to navigation which Congress has every right to seek to abate under its interstate commerce powers.

It would, of course, make a mockery of those powers if its authority to control pollution was limited to the bed of the navigable stream itself. The tributaries which join to form the river could then be used as open sewers as far as federal regulation was concerned. The navigable part of the river could become a mere conduit for upstream waste.

Such a situation would have vast impact on interstate commerce. States with cities and industries situated upstream on the nonnavigable tributaries of our great rivers could freely use them for dumping raw sewage and noxious industrial wastes upon their downstream neighboring states. There would be great pressure upon the upstream states to allow such usage. Reduced industrial costs and lower taxes thus resulting would tend to place industries, cities and states located on navigable rivers at a considerable competitive disadvantage in interstate commerce. In such a situation industrial frontage on a creek which flowed ultimately into a navigable stream would become valuable as an access point to an effectively unrestricted sewer.

The courts have taken no such narrowly restricted view of either the commerce power or the navigational servitude. In Oklahoma ex rel. Phillips v. Atkinson Co., 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed. 1487 (1941), the state of Oklahoma sought to restrain the building of the Denison Reservoir on the Red River. At the point in question in Oklahoma the Red River was not and never had been navigable. The Denison project had been authorized by Congress "to control the watershed of one of the principal tributaries of the Mississippi in alleviation of floods in the lower Red River and Mississippi Valleys." Oklahoma ex rel. Phillips v. Atkinson Co., *supra* at 520, 61 S.Ct. at 1057. The Supreme Court held that "[I]t is clear that Congress may exercise its control over the non-navigable stretches of a river in order to preserve or promote commerce on the navigable portions." *Id.* at 523, 61 S.Ct. at 1058. Nonnavigability of the stream controlled was held irrelevant because the Congressional act had an effect on the total commerce function of the navigable river. The opinion also said:

"We would, however, be less than frank if we failed to recognize this project as part of a comprehensive flood-control program for the Mississippi itself. But there is no constitutional reason why Congress or the courts should be blind to the engineering prospects of protecting the nation's arteries of commerce through control of the watersheds. There is no constitutional reason why Congress cannot, under the commerce power, treat the watersheds as a key to flood con-

trol on navigable streams and their tributaries. Nor is there a constitutional necessity for viewing each reservoir project in isolation from a comprehensive plan covering the entire basin of a particular river. We need no survey to know that the Mississippi is a navigable river. We need no survey to know that the tributaries are generous contributors to the floods of the Mississippi. And it is common knowledge that Mississippi floods have paralyzed commerce in the affected areas and have impaired navigation itself. *We have recently recognized that 'Flood protection, watershed development, recovery of the cost of improvements through utilization of power are . . . parts of commerce control.'* United States v. Appalachian Power Co., *supra*, [311 U.S. 377], page 426 [61 S.Ct. 291, page 308, 85 L.Ed. 243]. *And we now add that the power of flood control extends to the tributaries of navigable streams.* For, just as control over the non-navigable parts of a river may be essential or desirable in the interests of the navigable portions, so may the key to flood control on a navigable stream be found in whole or in part in flood control on its tributaries. As repeatedly recognized by this Court from M'Culloch v. Maryland, 4 Wheat. 316 [4 L.Ed. 579] to United States v. Darby, 312 U.S. 100 [61 S.Ct. 451, 85 L.Ed. 609], the exercise of the granted power of Congress to regulate interstate commerce may be aided by appropriate and needful control of activities and agencies which, though intrastate, affect that commerce." Oklahoma ex rel. Phillips v. Atkinson Co., *supra* at 525–526, 61 S.Ct. at 1059–1060. (Emphasis added.) (Footnote omitted.)

The parallel seems clear to us. Pollution control of navigable streams can only be exercised by controlling pollution of their tributaries. If "the power of flood control extends to the tributaries of navigable streams," (see emphasized language above) then we believe that the power of pollution control extends to the tributaries of navigable streams likewise.

If the *Atkinson* case left any doubt, it was surely resolved in United States v. Grand River Dam Authority, 363 U.S. 229, 80 S.Ct. 1134, 4 L.Ed.2d 1186 (1960). In this case Oklahoma as a state desired to develop power projects on the Arkansas River, and Congress by the 1941 Flood Control Act, adopted one of the sites at Fort Gibson which Oklahoma had franchised to a state agency. The state agency sued for compensation and the Supreme Court said:

"The Government contends that the navigational servitude of the United States extends also to nonnavigable waters, pre-empting state-created property rights in such waters, at least when asserted against the Government. In the view we take in this case, however, it is not necessary that we reach that contention. Congress by the 1941 Act, already mentioned, adopted as one work of improvement 'for the benefit of navigation and the control of destructive floodwaters' the reservoirs in the Grand River. That action to protect the 'navigable capacity' of the Arkansas River (United States v. Rio Grande Irrigation Co., 174 U.S. 690, 708 [19 S.Ct. 770, 777, 43 L.Ed. 1136]) was within the constitutional power of Congress. We held in Oklahoma v. Atkinson Co., 313 U.S. 508 [61 S.Ct. 1050, 85 L.Ed. 1487], that the United States over the objection of Oklahoma could build the Denison Dam on the Red River, also nonnavigable, but a tributary of the Mississippi. We there stated, 'There is no constitutional reason why Congress cannot, under the commerce power, treat the watersheds as a key to flood control on navigable streams and their tributaries.' *Id.*, [313 U.S.] at 525 [61 S.Ct. at 1059]. And see United States v. Appalachian Power Co., 311 U.S. 377, 426 [61 S.Ct. 291, 308, 85 L.Ed. 243]; Grand River Dam Authority v. Grand-

Hydro, 335 U.S. 359, 373 [69 S.Ct. 114, 121, 93 L.Ed. 64]. We also said in Oklahoma v. Atkinson Co., *supra*, that '. . . the power of flood control extends to the tributaries of navigable streams.' *Id.*, [313 U.S.] at page 525 [61 S.Ct. [1050], at pages 1059, 1060]. We added, 'It is for Congress alone to decide whether a particular project, by itself or as part of a more comprehensive scheme, will have such a beneficial effect on the arteries of interstate commerce as to warrant it. That determination is legislative in character.' *Id.*, [313 U.S.] at 527 [61 S.Ct. [1050], at 1060]. We held that the fact that the project had a multiple purpose was irrelevant to the constitutional issue, *Id.*, [313 U.S.] at 528–534 [61 S.Ct. at 1060–1063] as was the fact that power was expected to pay the way. *Id.*, [313 U.S.] at 533 [61 S.Ct. at 1063] '[T]he fact that ends other than flood control will also be served, or that flood control may be relatively of lesser importance, does not invalidate. the exercise of the authority conferred on Congress.' *Id.*, [313 U.S.] at 533–534 [61 S.Ct. at 1063]." United States v. Grand River Dam Authority, *supra*, at 232–233, 80 S.Ct. at 1136–1137. (Footnote omitted.)

In another and somewhat earlier case the Supreme Court had recognized that the government's right to aid navigation sometimes impinges on the advantages otherwise owned by riparian owners. In United States v. Willow River Co., 324 U.S. 499, 65 S.Ct. 761, 89 L.Ed. 1101 (1945), the Court said:

"Operations of the Government in aid of navigation ofttimes inflict serious damage. or inconvenience or interfere with advantages formerly enjoyed by riparian owners, but damage alone gives courts no power to require compensation where there is not an actual taking of property." *Id.* at 510, 65 S.Ct. at 767.

■ Thus, the doctrine of navigational servitude entitles the federal government to control the quality of effluent from riparian owners whose land drains into nonnavigable streams in pursuance of the federal interest in preserving the navigability and the quality of the navigable waters of the commerce-carrying rivers into which these tributaries flow.

These cases have never been overruled or modified and appear to us clearly to uphold the authority which Congress sought to exercise in the Federal Water Pollution Control Act Amendments of 1972.

The government in this case, however, pins its argument primarily upon the wider concept that water pollution is subject to Congressional restraint because it affects commerce in innumerable ways and because it affects the health and welfare of the nation, Wickard v. Filburn, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The statute lends some weight to the government's argument by its many references (some of which we have quoted above) to aspects of pollution control which have no possible direct bearing on navigability. Congressional concern in the 1972 Act with the impact of pollution upon fishing for commercial purposes or upon bathing and fishing and boating for recreational purposes of interstate travelers, and for the needs of towns, cities, industries and farms for unpolluted water for both health and commerce supports this broader concept. Congress, as indicated above, intended to exercise its full constitutional powers, and we are required to give effect to that intention. McCulloch v. Maryland, 17 U.S. (4 Wheat.) 316, 423, 4 L.Ed. 579 (1819); United States v. Appalachian Power Co., 311 U.S. 377, 423–429, 61 S.Ct. 291, 85 L.Ed. 243 (1940); United States v. Darby, 312 U.S. 100, 115, 61 S.Ct. 451, 85 L.Ed. 609 (1941). The generous construction of water pollution laws required by the Supreme Court is amply demonstrated in many cases. *See* United States v. Pennsylvania In-

dustrial Chemical Corp., 411 U.S. 655, 669–670, 93 S.Ct. 1804, 36 L.Ed.2d 567 (1973); United States v. Standard Oil Co., 384 U.S. 224, 226, 230, 86 S.Ct. 1427, 16 L.Ed.2d 492 (1966); United States v. Republic Steel Corp., 362 U.S. 482, 491, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960).

In United States v. Standard Oil, the Supreme Court said:

"Oil is oil and whether useable or not by industrial standards it has the same deleterious effect on waterways. In either case, its presence in our rivers and harbors is both a menace to navigation and a pollutant." United States v. Standard Oil Co., *supra*, 384 U.S. at 226, 86 S.Ct. at 1428.

■■■ We hold that the provisions of the Water Pollution Control Act Amendments of 1972 are constitutional and were constitutionally applied by the District Court.

### III   The Burden of Proof

■ The only remaining question of importance in this case concerns whether or not the government must bear the burden of establishing not merely that oil was discharged into a tributary of a navigable stream, but also that, in fact, the oil reached and polluted the navigable river.[3] To state the question is to recognize the impossibility of such proof in many if not all cases. Drops (or barrels) of oil carry no fingerprints. At the juncture of the Pond River and the Green River water analysis which might show oil pollution could not possibly prove which polluter discharged it, in what proportion, or on what occasion. Nor where many offenders are involved in creating a great social problem is such proof constitutionally required. Wickard v. Filburn, 317 U.S. 111, 127–128, 63 S.Ct. 82, 87 L.Ed. 122 (1942). The following portion of the Report of the Senate Committee on Public Works fully demonstrates Congressional under-

standing of this problem and sheds light on Congressional intent:

"The control strategy of the Act extends to navigable waters. The definition of this term means the navigable waters of the United States, portions thereof, tributaries thereof, and includes the territorial seas and the Great Lakes. Through a narrow interpretation of the definition of interstate waters the implementation [of the] 1965 Act was severely limited. Water moves in hydrologic cycles and *it is essential that discharge of pollutants be controlled at the source.* Therefore, reference to the control requirements must be made to the navigable waters, portions thereof, and their tributaries." S.Rep.No.414, 92d Cong., 2d Sess., U.S.Code Cong. & Admin.News, pp. 3742–3743 (1972) (Emphasis added.)

We believe that the analysis of the Act set forth above amply demonstrates that Congress was concerned with pollution of the tributaries of navigable streams as well as with the pollution of the navigable streams. We also believe that it is incontestable that substantial pollution of one not only may but very probably will affect the other. *See* United States v. American Cyanamid Co., 480 F.2d 1132 (2d Cir. 1973).

The construction of the statute urged by appellant in this regard would be violative of the generous construction of water pollution legislation mandated by the Supreme Court. *See* United States v. Pennsylvania Industrial Chemical Corp., *supra;* United States v. Standard Oil Co., *supra*. In this regard the strict construction rule applicable to criminal statutes has clearly been modified by the Supreme Court. United States v. Standard Oil Co., *supra*, 384 U.S. at 225, 86 S.Ct. 1427.

We agree with Judge Gordon that the facts in this case disclose that the notice

---

3. This question, of course, relates only to the navigational servitude aspect of the preceding constitutional holdings.

of the discharge of oil required to be given "immediately" by 33 U.S.C. § 1321 (b)(5) was not so given.

For the reasons outlined above and further set out in the opinion of the District Judge, we affirm the judgment of the District Court.[4]

4. The government belatedly complains of the inadequacy of the $500 fine and argues that probation would be desirable as an additional deterrent. However appropriate this may be in future cases, it is clear to us that the United States Attorney recommended the penalty which the District Judge administered and that the United States made no effort to appeal the sentence.