**UNITED STATES of America,**
**Plaintiff,**

**v.**

**PHELPS DODGE CORPORATION,**
**Defendant.**

**No. CR 74–776–TUC–WCF.**

United States District Court,
D. Arizona.

April 8, 1975.

William C. Smitherman, U. S. Atty., Dist. of Arizona by Daniel G. Knauss, Asst. U. S. Atty., Tucson, Ariz., for plaintiff.

John F. Boland, Jr., Evans, Kitchel & Jenckes, P.C., Phoenix, Ariz., for defendant.

### MEMORANDUM AND ORDER

FREY, District Judge.

On December 13, 1974, the Office of the United States Attorney filed an Information in this Court, charging defendant Phelps Dodge Corporation with polluting navigable waters of the United States in violation of Title 33, United States Code, Sections 1311(a) and 1319 (c)(1).

On February 14, 1975, defendant filed the first of two Motions to Dismiss the Information. In this first motion defendant asserts, *inter alia*, that the term "waters of the United States" as used in the Federal Water Pollution Control Act Amendments of 1972 is so vague and indefinite that it fails to give fair warning of the conduct that is criminal and therefore violates the Due Process Clause of the Fifth Amendment to the United States Constitution.

Defendant filed a second Motion to Dismiss on March 3, 1975. Therein de-

fendant seeks dismissal due to the failure of the Administrator of the Environmental Protection Agency to give the mandatory abatement order pursuant to Title 33, United States Code, Section 1319(a)(3).

A hearing was conducted March 10, 1975, at which time both of defendant's motions were heard by this Court. At the conclusion of the hearing the matter was submitted to this Court for further consideration. The Court will first consider defendant's second motion to dismiss which discusses the issue of whether the E.P.A. Administrator must give an abatement order under Title 33, United States Code, Section 1319(a)(3) before a criminal action can be instituted.

The enforcement provisions of the FWPCA, Title 33, United States Code, Section 1319(a)(3), sets forth two courses of action which are open to the Administrator when he becomes aware of a violation of the Act. He must either file a civil action against the person he believes to be a violator, or he must give such person an abatement order.

"Whenever on the basis of any information available to him the Administrator finds that any person is in violation of Section 301, 302, 306, 307 or 308 of this Act [33 U.S.C. §§ 1311, 1312, 1316, 1317, 1318], or is in violation of any permit condition or limitation implementing any of such sections in a permit issued under section 402 of this Act [33 U.S.C. § 1342] by him or by a State, he *shall issue an order* requiring such person to comply with such section or requirement, or he *shall bring a civil* action in accordance with subsection (b) of this section." 33 U.S.C. § 1319(a)(3). (Emphasis Added)

■ A review of the legislative history of the Act reveals that the Administrator's duty to issue an abatement order is mandatory. During Senate consideration of the Conference Committee Report, the following was entered on the record by Senator Muskie:

"It is important to note however, that the provisions requiring the Administrator to issue an abatement order whenever there is a violation were *mandatory* in both the Senate bill and the House amendment, and the Conference agreement contemplates that the Administrator's duty to issue an abatement order remains a mandatory one."

A Legislative History of the Federal Water Pollution Control Act Amendments of 1972, U. S. Government Printing Office at 174. (Emphasis Added)

In response to defendant's motion, plaintiff argues to the Court that if the Administrator was limited to either issue a compliance order or to commence a civil action for all violations, Section 1319(c)(1), authorizing criminal actions where there has been a willful or negligent violation, would be meaningless. A fair reading of the statute in light of its legislative history reveals that such would be the case. In House debate, Representative Harsha indicates the issuance of an abatement order is a necessary condition precedent to the filing of a criminal action:

"Assuming there was some discharge of pollutants contrary to this act *and* the Administrator *notified the violating party as he is required under this act* and told him what he was doing wrong and told him where it was happening, and *ordered the violator to stop,* and *if* the polluter did not obey that order, *then* the polluter becomes a willful violator and can be [criminally] charged under this section as a willful violator." *Legislative History, supra,* at 530. (Emphasis Added)

However, the House Committee Report on this bill (Federal Water Pollution Control Act Amendments of 1972) from the Committee on Public Works, (*Legis-*

*lative History, supra,* at 114), contains the following language:

"Section 309—Federal Enforcement.

"The Committee has provided fast, effective, and straightforward enforcement procedures to replace enforcement conferences and 180 day notices in the Water Quality Act of 1965. Section 309 contains provisions for Federal enforcement of violations of an unpermitted discharge under Section 301 or a violation of any permit condition or limitation which implements any effluent limitation under Section 302, any performance standard under Section 306, any toxic effluent standard under Section 307, any inspection, monitoring or entry requirement under Section 308, and any discharge permit issued in an approved State permit program under Section 402 or a permit issued by the Administrator under Section 402 of this Act.

"Whenever on the basis of any information available to him the Administrator finds that anyone is in violation of any of these requirements, he *may* take *any* of the following enforcement actions: (1) he shall issue an order requiring compliance; (2) he shall notify the person in alleged violation in such State of such finding. If beyond the 30th day after the Administrator's notification, the State has not commenced appropriate enforcement action, the Administrator shall issue an order requiring such person to comply with a permit or a condition or limitation of a permit; *or* (3) he shall bring a civil action; *or* (4) he shall cause to be instituted criminal proceedings.

"Any civil action commenced by the Administrator shall be for appropriate relief including a permanent or temporary injunction in any case where the Administrator is authorized to issue a compliance order. Any person who violates any of these provisions or who violates an order issued by the Administrator shall be subject to a civil penalty of not to exceed $10,000 per day of such violation.

"In the case of a *willful or negligent violation* by any person of Section 301, 302, 306, 307, 308, or 316, or any permit condition or limitation implementing any of these sections in a permit issued under Section 402 of this Act by the Administrator or by a State shall be punished by a criminal penalty of a fine of not less than $2,500 nor more than $25,000 per day of violation or by imprisonment for not more than one year or by both. Any subsequent conviction for a violation by such a person shall be subject to a criminal penalty of a fine of not more than $50,000 per day of violation or by imprisonment for not more than two years or by both." (Emphasis Added)

■ Thus, it seems clear that the bill as finally submitted and passed was intended to provide that while the Administrator *must* act in case af any violations, he has alternative methods of acting; i. e., either by civil or by criminal proceedings. He is not required to proceed first to effect a correction by civil means before instituting criminal proceedings.

■ As for defendant's contention that Section 1311(a) of the Federal Water Pollution Control Act Amendments of 1972 is void for vagueness, the issue is close. This Court is reluctant to attempt to strike down a statute enacted by Congress. Where the issue appears so narrow as here the Court will presume correctness and adopt a construction which lends effect to the clear intent of Congress.

Obviously Congress did not specifically define the term "waters of the United States." The test, as correctly stated by both parties, is whether the term is sufficiently clear or definite and certain as to give fair warning of the conduct that is criminal.

Plaintiff cites Boyce Motor Lines Inc. v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367; and Lanzetta v. New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83

L.Ed. 888. Defendant cites Bouie v. Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894; and United States v. Harriss, 347 U.S. 612, 74 S.Ct. 808, 98 L.Ed. 989. *Boyce* refers to or interprets the validity of an Interstate Commerce Commission regulation, *Lanzetta* and *Bouie* refer to or interpret state criminal statutes; *Harriss*, however, deals with an Act of Congress and is most persuasive.

More particularly *Harriss* is persuasive because one of the arguments made in support of the "vagueness" contention was that the Act would be a deterrent to exercise of First Amendment rights, yet the Court upheld the validity of the legislation because on its face it is "plainly within the area of congressional power and is designed to safeguard a vital national interest." 347 U.S. 626, 74 S.Ct. 816. That is the case here.

The dissent in *Harriss* indicates the vagueness test should be more stringently adhered to because the legislation is in the domain of the First Amendment. Thus, *Harriss* points out, as counsel for plaintiff has done here, that\ the Supreme Court is less inclined to strike down a congressional enactment on "vagueness" if it involves regulatory measures than it is if constitutionally protected acts or conduct of individuals are involved.

The term "waters of the United States" as used in context of the Act and in keeping with the legislative intent apparently means just what is says: "all waters of the United States including the territorial seas."

Congress clearly stated the goals and policy behind the Act; insofar as they pertain to the case at hand:

"The objective of this chapter is to restore and maintain the chemical, physical, and biological integrity of the Nation's waters. In order to achieve this objective it is hereby declared that, consistent with the provisions of this chapter . . .

\*    \*    \*    \*    \*    \*

"(3) it is the national policy that the discharge of toxic pollutants in toxic amounts be prohibited;

\*    \*    \*    \*    \*    \*

"(5) it is the national policy that areawide waste treatment management planning processes be developed and implemented to assure adequate control of sources of pollutants in each State; and

"(6) it is the national policy that a major research and demonstration effort be made to develop technology necessary to eliminate the discharge of pollutants into the navigable waters, *waters of the contiguous zones,* and the oceans. (Emphasis Added) 33 United States Code, Section 1251.

Given these goals and policies by Congress, it is clear that the information filed in the case at hand is proper and the motions to dismiss are not well taken. Of course, whether the evidence will support a conviction is something else which cannot now be determined. There is other support for the government's position in this matter.

As stated in United States v. Ashland Oil and Transportation, 504 F.2d 1317 (6th Cir. 1974):

"Like the District Judge, we believe Congress knew exactly what it was doing and that it intended the Federal Water Pollution Control Act to apply as Congressman Dingell put it, 'to all water bodies including main streams and their tributaries.' Certainly the Congressional language must be read to apply to our instant case involving pollution of one of the tributaries of a navigable river. Any other reading would violate the specific language of the definition just quoted and turn a great legislative enactment into a meaningless jumble of words." 504 F.2d 1325.

The Court further and aptly stated the constitutional power of Congress with respect to this Act:

"II   The Constitutional Power

"Whatever Congress may have intended, its enactments to be valid must be within its legislative authority under the Constitution of the United States. Our forefathers in writing the Constitution could have had no concept of the water pollution problems of today. But they had a specific concept of the importance of interstate commerce and specifically gave Congress power to regulate it: .

'The Congress shall have Power . .

'To regulate Commerce . . . among the several States . . .' U.S.Const. art. I, § 8, cl. 3.

"Likewise, the authors of the Constitution provided Congress broad legislative authority to pass laws concerning future unknown problems which might affect the health and welfare of the nation:

'All legislative Powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives.' U.S.Const. art. I, § 1.

'The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States; . . .

'To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.' U.S.Const. art. 1, § 8.

"See Steward Machine Co. v. Davis, 301 U.S. 548, 57 S.Ct. 883, 81 L.Ed. 1279 (1937); Helvering v. Davis, 301 U.S. 619, 57 S.Ct. 904, 81 L.Ed. 1307 (1937); City of Cleveland v. United States, 323 U.S. 329, 65 S.Ct. 280, 89 L.Ed 274 (1945).

"We believe that the language of the Federal Water Pollution Control Act and its legislative history show that the United States Congress was convinced that uncontrolled pollution of the nation's waterways is a threat to the health and welfare of the country, as well as a threat to its interstate commerce.

"Obviously water pollution is a health threat to the water supply of the nation. It endangers our agriculture by rendering water unfit for irrigation. It can end the public use and enjoyment of our magnificent rivers and lakes for fishing, for boating, and for swimming. These health and welfare concerns are, of course, proper subjects for Congressional attention because of their many impacts upon interstate commerce generally. But water pollution is also a direct threat to navigation—the first interstate commerce system in this country's history and still a very important one.

"Some years ago the United States Supreme Court supplied a dramatic illustration of this last problem:

'The seaman lost his life on the tug, *Arthur N. Herron,* which, on the night of November 18, 1952, while towing a scow on the Schuylkill River in Philadelphia, caught fire when an open-flame kerosene lamp on the deck of the scow ignited highly flammable vapors lying above an extensive accumulation of petroleum products spread over the surface of the river. Several oil refineries and facilities for oil storage, and for loading, and unloading petroleum products, are located along the banks of the Schuylkill River. The trial court found that the lamp was not more than three feet above the water.' Kernan v. American Dredging Co., 355 U.S. 426, 427, 78 S.Ct. 394, 395, 2 L.Ed.2d 382 (1958).

"We also know (and we take judicial notice) that two of the important rivers of this circuit, the Rouge River in Dearborn, Michigan, and the Cuyahoga River in Cleveland, Ohio, reached a point of pollution by flammable materials in the last ten years that they repeatedly caught fire. Such pollution

is an obvious hazard to navigation which Congress has every right to seek to abate under its interstate commerce powers.

"It would, of course, make a mockery of those powers if its authority to control pollution was limited to the bed of the navigable stream itself. The tributaries which join to form the river could then be used as open sewers as far as federal regulation was concerned. The navigable part of the river could become a mere conduit for upstream waste.

"Such a situation would have vast impact on interstate commerce. States with cities and industries situated upstream on the nonnavigable tributaries of our great rivers could freely use them for dumping raw sewage and noxious industrial wastes upon their downstream neighboring states. There would be great pressure upon the upstream states to allow such usage. Reduced industrial costs and lower taxes thus resulting would tend to place industries, cities and states located on navigable rivers at a considerable competitive disadvantage in interstate commerce. In such a situation industrial frontage on a creek which flowed ultimately into a navigable stream would become valuable as an access point to an effectively unrestricted sewer."

■ For the purposes of this Act to be effectively carried into realistic achievement, the scope of its control must extend to all pollutants which are discharged into *any waterway*, including normally dry arroyos, where any water which might flow therein could reasonably end up in any body of water, to which or in which there is some public interest, including underground waters.

■ The intention of Congress was to eliminate or to reduce as much as possible *all water pollution* throughout the United States both surface and underground. To achieve this purpose Congress provided the Administrator broad powers, including emergency powers set out in Title 33, United States Code, Section 1364. Congress even granted the right to citizens to bring suit against any person, the United States and any other governmental agency, consistent with the eleventh amendment, and any administrator if need be to correct a water pollution problem. Title 33, United States Code, Section 1365.

■ Thus a legal definition of "navigable waters" or "waters of the United States" within the scope of the Act includes any waterway within the United States also including normally dry arroyos through which water may flow, where such water will ultimately end up in public waters such as a river or stream, tributary to a river or stream, lake, reservoir, bay, gulf, sea or ocean either within or adjacent to the United States.

■ Thus, the argument that the statute is so vague that it fails to give fair warning of the conduct that it makes criminal, is without merit. The cases cited by the government on pages 4 through 11 of its memorandum are apposite. There is no need to reiterate the government's argument on this issue or expound on it. Counsel seems to have done an adequate job.

■ Defendant makes the argument that ex post facto principles are involved here. Because of the uncertainty of what constitutes "waters of the United States", defendant contends that it now could be punished for doing something which was not clearly unlawful when the act was done. This, defendant argues, is possible by virtue of an interpretation which might be given to the term "waters of the United States."

Again the government's memorandum effectively rebuts this argument and no more comment by the Court is necessary. We simply do not have a situation comparable to Bouie v. City of Columbia, 378 U.S. 347, 85 S.Ct. 1697, 12 L.Ed.2d 894, where there was unforeseeable judicial enlargement of a criminal statute applied retroactively.

What we have here is that the defendant made its own determination, interpretation or estimate of what the law in question meant or was intended to

cover and acted accordingly. Defendant's position is akin to that of the respondent in F. T. C. v. Colgate-Palmolive Co., 380 U.S. 374, 85 S.Ct. 13 L.Ed. 2d 904; and the petitioner in Boyce Motor Lines v. United States, 342 U.S. 337, 72 S.Ct. 329, 96 L.Ed. 367.

"And thereupon it is said that the crime thus defined by the statute contains in its definition an element of degree as to which estimates may differ, with the result that a man might find himself in prison because his honest judgment did not anticipate that of a jury of less competent men." Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232.

"The criterion in such cases is to examine whether common social duty would, under the circumstances have suggested a more circumspect conduct." 1 East, P.C. 262, as cited in *Nash, supra.* See also United States v. Petrillo, 332 U.S. 1, 67 S.Ct. 1538, 91 L.Ed. 1877.

It is ordered that defendant's motions to dismiss, are denied.

It is further ordered that the Clerk of this Court forthwith mail a copy of this Memorandum and Order to all counsel of record.