**UNITED STATES of America**

**v.**

**SAINT BERNARD PARISH and State of Louisiana.**

**Civ. A. No. 83–3201.**

United States District Court, E.D. Louisiana.

June 26, 1984.

Asst. U.S. Atty., Carol E. Dinkins, Washington, D.C., John Volz, William F. Baity, New Orleans, La., John C. Martin, F. Henry Habicht, II, and Reed W. Neuman, Trial Atty., Environmental Enforcement Section, Land and Natural Resources Div., U.S. Dept. of Justice, Washington, D.C., Alan W. Eckert, Senior Litigator, U.S.E.P.A., Washington, D.C., for plaintiff.

John F. Rowley, Dist. Atty., William P. Schuler, Asst. Dist. Atty., Parish of St. Bernard, Chalmette, La., for St. Bernard Parish.

William J. Guste, Jr., Peter M. Arnow, Warren E. Byrd, II, Louisiana Dept. of Justice, Baton Rouge, La., for State of La.

## OPINION

ARCENEAUX, District Judge.

This matter came before the Court on motions for summary judgment by St. Bernard Parish ("St. Bernard") and the United States of America ("United States"). After hearing oral argument on June 6, 1984, the motion of St. Bernard was DENIED and the motion of the United States was GRANTED for reasons set forth hereinafter.

The United States instituted this suit pursuant to § 309 of the Clean Water Act ("the Act"), 33 U.S.C. § 1319, seeking injunctive relief and assessment of civil penalties against St. Bernard for alleged unlawful discharge of pollutants from its Munster Wastewater Treatment Plant near Meraux, Louisiana, into the Forty Arpent Canal ("the Canal"). In its motion, the United States seeks partial summary judgment on liability for 73 violations of conditions set forth in a five year National Pollutant Discharge Elimination System ("NPDES") permit issued to St. Bernard for operations at the Munster Plant by the Environmental Protection Agency ("EPA") on October 28, 1974. The United States also seeks summary judgment on St. Bernard's continuous and continuing operation of the Munster Plant without a NPDES permit since expiration of the previously held permit on October 28, 1979.

St. Bernard's only defense to these allegations is set forth in its motion for summary judgment: the Forty Arpent Canal is not a "navigable water" as defined by the Clean Water Act.[1] Therefore, St. Bernard argues that both the EPA and this Court lack jurisdiction over the operations of the Munster Plant. St. Bernard concedes that the 73 alleged violations of the 1974 NPDES permit did occur. It also admits that the Munster Plant is and has been discharging effluents into the Canal without a NPDES permit since October 28, 1979.

## UNDISPUTED FACTS

It is undisputed that the Canal is approximately six miles long, 100–150 feet wide and 6.5 feet deep. It is bordered on its northern side by a levee approximately 30

1. The Act prohibits "discharge of any pollutant by any person." 33 U.S.C. § 1311(a). "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12). The Act's definition of "navigable waters" is "waters of the United States, including the territorial seas." 33 U.S.C. § 1362(7).

feet high, which separates the Canal from wetlands adjacent to its entire northern side. Two pumping stations are located on this levee.

The Canal and the two pumping stations are operated, maintained and controlled by the Lake Borgne Basin Levee District ("Levee District"), a State of Louisiana agency; St. Bernard exercises no maintenance or operational control over the Canal or the pumps. The Canal's historical and present purpose is flood control. The Canal receives substantial storm and flood water run-off from numerous smaller drainage canals which flow into it. When the Levee District deems it appropriate, the pumping stations reduce the water level in the Canal by pumping its waters into open water pools in the wetland area.[2] These pools are connected by open water channels through the wetland to Bayou Bienvenue and the Mississippi River Gulf Outlet.

St. Bernard also does not dispute that previous to October, 1980, the Canal sustained both plant and fish aquatic life. Since that time, such life is non-existent due in whole or in part to the discharge of raw sewage by the Munster Plant. As late as 1942, the Canal was directly connected by surface waters to Lake Borgne via the Lake Borgne Canal and Bayou Dupre.

### LAW

As it relates to the plaintiff's claims of permit violations between 1974 and 1979, it is clear that St. Bernard's challenge to the classification of the Forty Arpent Canal as a "water of the United States" subject to EPA control is barred from consideration by this Court. Review of administrative action in issuing or denying any permit is delegated to the Court of Appeals under the Clean Water Act. 33 U.S.C. § 1369(b)(1). While this Court is vested with jurisdiction over claims of permit violations under 33 U.S.C. § 1319, the Act specifically bars judicial review of any administrative action which could have been taken to the Circuit Court in any civil or criminal enforcement proceeding in the District Court. 33 U.S.C. § 1369(b)(2). See: *Sun Enterprises v. Train,* 532 F.2d 280 (2d Cir.1976); *U.S. v. Velsicol Chemical Corp.,* 438 F.Supp. 945 (W.D.Tenn.1976).

■ This Court believes that the liability imposed for permit violations under the Clean Water Act is a variety of strict liability where neither fault nor intent is relevant to determination thereof. See: *United States v. Earth Sciences, Inc.,* 599 F.2d 368 (10th Cir.1979). Having in fact admitted to its liability for the 73 permit violations set forth and documented by the United States in its motion, summary judgment is appropriate on this issue.

Likewise, St. Bernard does not dispute that it has been discharging raw sewage into the Forty Arpent Canal without a permit since October 28, 1979. Rather, it argues that such activity is not subject to either EPA regulation or the jurisdiction of this Court because the Canal is not a "water of the United States" as defined by the Clean Water Act. In focusing its challenge on this characterization, St. Bernard does not dispute that it would otherwise be subject to regulation under the Act, or that its Munster Plant activities would otherwise be deemed unlawful under the Act. Instead, it argues that the discharge should be measured at the point where the water is pumped from the Forty Arpent Canal into the wetland area.

■ It is clear that the statutory goal of the Act is to restore and maintain the chemical, physical and biological integrity of the nation's waters and to eliminate the discharge of pollutants into those waters. 33 U.S.C. § 1251(a); *Avoyelles Sportsmen's League, Inc. v. Marsh,* 715 F.2d 897 (5th Cir.1983); *Velsicol, supra.* It is likewise clear that Congress intended to give the term "navigable waters," as defined in the Act as "waters of the United States," the broadest possible constitutional inter-

**2.** The parties stipulate that this adjacent wetland area is clearly a "water of the United States" subject to the Act.

pretation. *Avoyelles, supra; U.S. v. Byrd,* 609 F.2d 1204 (7th Cir.1979); *Leslie Salt Co. v. Froehlke,* 578 F.2d 742 (9th Cir. 1978); *U.S. v. Robinson,* 570 F.Supp. 1157 (M.D.Fla.1983).

 In keeping with this congressional mandate, the EPA promulgated a comprehensive definition of "waters of the United States." 33 U.S.C. § 1362(7).[3] Similarly, with reliance on the Congressional Record, Courts have liberally construed the definitional language to include all the waters within the geographic confines of the United States. *Byrd, supra; U.S. v. Ashland Oil & Transportation Co., Inc.,* 504 F.2d 1317 (6th Cir.1974). Although the presence and function of the pumps between the Canal and the adjacent wetlands make application of the Act in this matter *res nova,* it is with little difficulty that the Court finds that the Forty Arpent Canal is a "water of the United States" under both the EPA definition and the rationale set forth in interpretative jurisprudence.

First, the Forty Arpent Canal is a water "the use, degradation or destruction of which would affect or could affect interstate or foreign commerce" under 40 CFR § 122.2(c). It is a substantial body of water, integrally linked with waters which feed directly into the Gulf Outlet of the largest and most heavily trafficked river in this country. Due to its size and location, it is readily conceivable that this Canal could be used by interstate or foreign travelers for recreational or other purposes.

40 CFR § 122.2(c)(1). Until as recently as one year after St. Bernard commenced to bypass its raw sewage into the Canal, it harbored fish or shellfish the pursuit of which could provide enjoyment to recreational fisherman. In addition, those fish or shellfish, like others found in Louisiana waters, could be taken and sold in interstate or foreign commerce, thereby providing a livelihood for working fishermen. 40 CFR § 122.2(c)(2).

Secondly, this Court believes that the Forty Arpent Canal is a tributary of the adjacent wetlands. 40 CFR § 122.2(e). Congress intended to control both the discharge of pollutants directly into navigable waters and the discharge of pollutants into non-navigable tributaries which flow into the navigable waters. *Ashland, supra.* The scope of the Act's control extends to discharge into any waterway where any water which might flow therein could reasonably end up in any body of water, to which or in which there is some public interest. *U.S. v. Phelps Dodge Corp.,* 391 F.Supp. 1181 (D.Ariz.1975). The public interest in the wetlands, bayous, and the Mississippi River Gulf Outlet, waters into which the sewage of the Munster Plant regularly finds its way, is obvious.

At this point, a review of the legislative and judicial rationale underlying an expansive definition of waters covered by the Act is critical. "Water moves in hydrologic cycles and it is essential that discharge of

---

**3.** The EPA definition, 40 CFR § 122.2, provides in pertinent part:
Waters of the United States or waters of the U.S. means:
 (a) All waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide;
 (b) All interstate waters, including interstate "wetlands;"
 (c) All other waters such as intrastate lakes, rivers, streams (including intermittent streams), mudflats, sandflats, "wetlands," sloughs, prairie potholes, wet meadows, playa lakes, or natural ponds the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce including any such waters:

(1) Which are or could be used by interstate or foreign travelers for recreational or other purposes.
(2) From which fish or shellfish are or could be taken and sold in interstate or foreign commerce; or
(3) Which are used or could be used for industrial purposes by industries in interstate commerce;
 (d) All impoundments of waters otherwise defined as waters of the United States under this definition;
 (e) Tributaries of waters identified in paragraphs (a)–(d) of this definition;
 (f) The territorial sea; and
 (g) "Wetlands" adjacent to waters (other than waters that are themselves wetlands) identified in paragraphs (a)–(f) of this definition.
 * * * * * *

pollutants be controlled at the source." S.Rep. No. 414, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. and Ad. News 3668, 3742–3743; *Avoyelles, supra; Ashland, supra.* Real protection of water must include protection of the complete aquatic system. Part of that system cannot be degraded or destroyed without adversely affecting the remaining parts. *Puerto Rico v. Alexander,* 438 F.Supp. 90 (D.C.D.C.1977).

The source of the pollution in the Forty Arpent Canal is the Munster Plant; it is this same pollution which threatens the livelihood of the wetlands every time the pumps are engaged. Although the Canal was once directly connected by surface waters to Lake Borgne, its waters were *controlled* in an effort to avoid flooding in the area. The waters are no less interstate as a result of this effort or due to the presence of the pumps and the levee. These merely control the natural flow of water to the wetlands; they control where nature does not. When the geography, history, and purpose of the manmade aids are considered, the destiny of the Canal's waters is necessarily an interstate concern.

Likewise, the suggestion that intermittent discharges are exempt from the Act must be rejected. *U.S. v. Texas Pipe Line Co.,* 611 F.2d 345 (10th Cir.1979); *Phelps Dodge, supra.* In addition, the fact that St. Bernard chooses to discharge its pollutants through the Forty Arpent Canal, as a conveyance owned by the State, cannot remove its activities from the scope of the Act. *Velsicol, supra.* To hold otherwise would mock the intent and power of Congress to legislate in this area as envisioned by the *Ashland* court:

> The tributaries which join to form the river could then be used as open sewers as far as regulation was concerned. The navigable part of the river could become a mere conduit for upstream waste ... In such a situation, industrial frontage on a creek which flowed ultimately into a navigable stream would become valuable as an access point to an effectively unrestricted sewer. *Ashland, supra* at 1326.

### AN OUNCE OF PREVENTION

As a final note, the Court believes that Congress enacted a much stronger law than that necessary to condemn the activities of St. Bernard in the matter *sub judice.* Over a decade ago, Congress dreamed of eliminating such ruin by 1985: pollution which "may" or "could" or "would" degrade our nation's waters was outlawed. It is now 1984, and St. Bernard continues to defy and ignore the letter and spirit of a well intentioned law. It condemns waters, not its own, to a septic existence. The result is real: St. Bernard's disregard has turned the Forty Arpent Canal into a cesspool. Not only is the Forty Arpent Canal septic, but there is evidence that its waters have likewise disgraced the adjacent wetlands. As a result, St. Bernard now faces severe sanctions, including possibly millions of dollars in fines, which shall be determined at a subsequent trial on remaining issues in this matter.

Accordingly,

IT IS ORDERED that the motion of St. Bernard Parish for summary judgment is DENIED. The motion for partial summary judgment filed by the United States of America is GRANTED.