**SOUTH CAROLINA WILDLIFE FEDERATION, Georgia Wildlife Federation, National Wildlife Federation, Atlanta Audubon Society, Friends of the Savannah River, Georgia Canoeing Association, Inc., League of Women Voters of Georgia, League of Women Voters of South Carolina, Sierra Club, South Carolina Environmental Coalition and Trout Unlimited, Plaintiffs,**

v.

**Clifford ALEXANDER, in his official capacity as Secretary of the Army, LTG John W. Morris, in his official capacity as Chief of Engineers, Department of the Army, Col. Frank-Walter, in his official capacity as District Engineer, Corps of Engineers, Douglas Costle, in his official capacity as Administrator, Environmental Protection Agency, and Cecil Andrus, in his official capacity as Secretary, Department of Interior, Defendants.**

Civ. A. No. 76–2167.

United States District Court,
D. South Carolina,
Greenville Division.

July 27, 1978.

120

Theodore A. Snyder, Jr., Walhalla, S. C., G. Philip Nowak, Clifford D. Stromberg, Washington, D. C., for plaintiffs; Oliver A. Houck, National Wildlife Federation, Washington, D. C., of counsel.

Geoffrey A. Mueller, Fred R. Disheroon, Dept. of Justice, Washington, D. C., J. D. McCoy, III, Asst. U. S. Atty., Greenville, S. C., for defendants.

CHAPMAN, District Judge.

This action is brought by various environmental groups against five government of-

ficials, in their official capacities,[1] seeking declaratory and injunctive relief in an effort to stop the construction and potential operation of the Richard B. Russell Dam and the continued operation of the Hartwell and Clark Hill Dams, all of which are located on the Savannah River which flows between South Carolina and Georgia. Plaintiffs allege that Hartwell and Clark Hill presently contribute and Russell will contribute to the pollution of the Savannah River by lowering the content of dissolved oxygen in its waters and creating increased amounts of various minerals in the water.

The bases for the relief sought lie in four counts of the complaint. Count I is grounded on the Federal Water Pollution Control Act, as amended by the Clean Water Act of 1977 (hereinafter the "Act" or "FWPCA"), 33 U.S.C. § 1251 et seq. Specifically, plaintiffs allege that defendants have violated and will continue to violate § 301 of the Act, 33 U.S.C. § 1311, by authorizing, financing, supporting, and participating in the construction and operation of Russell Dam and the continued operation of Hartwell and Clark Hill Dams, without a permit in accordance with § 402 of the Act, 33 U.S.C. § 1342. Section 301 essentially provides that unless certain permits are obtained (including a § 402 permit) and other prerequisites met, it shall be unlawful for any person to discharge any pollutant.

Count II alleges that defendant Administrator of the Environmental Protection Agency (EPA), hereinafter the "Administrator," is in violation of his enforcement duties under § 309 of the Act, 33 U.S.C. § 1319, because he has failed to issue an order directing the Corps of Engineers to comply with the FWPCA or to enjoin the construction and/or operation of the dams, having been fully informed that the water to be released from the Russell Dam will contain pollutants, as do the present releases from Hartwell and Clark Hill Dams.

Count III alleges that the Corps of Engineers and Secretary of the Interior have failed to comply with the National Environmental Policy Act of 1969, 42 U.S.C. § 4321, et seq., and the Fish and Wildlife Coordination Act, 16 U.S.C. § 661 et seq., by failing to thoroughly assess the loss or damage to fish and wildlife resources in Georgia and South Carolina attributable to the construction of the Russell Dam and by failing to consider and make adequate provision for the mitigation of such losses.

Count IV alleges that the Corps of Engineers has failed to comply with the National Environmental Policy Act by not revealing and assessing the possible geological dangers associated with the construction and operation of Russell Dam.

The matter presently before the Court is the motion of defendants to dismiss Counts I and II of the complaint, pursuant to Rule 12 of the Federal Rules of Civil Procedure, on the ground that these counts fail to state a claim upon which relief can be granted and because this Court lacks subject matter and personal jurisdiction.

It is defendants' position that this Court lacks jurisdiction to proceed with an adjudication of Counts I and II because the sovereign immunity of the United States against suit has not been waived as to the alleged violations. Moreover, defendants contend that plaintiffs have failed to comply with the notice provisions of § 505 of the FWPCA, 33 U.S.C. § 1365, as to Clark Hill and Hartwell Dams, and any suit as to Russell Dam is premature. As to the motion to dismiss for failure to state a claim upon which relief can be granted, defendants contend that §§ 301 and 309 of the Act are inapplicable to the activities of federal agencies in this matter and that the activities complained of do not fall within the prohibition of § 301(a), a requirement essential to the claims under Counts I and II.

## THE SOVEREIGN IMMUNITY ISSUE

It is defendants' contention that this Court is without jurisdiction because sover-

1. The Secretary of the Army; the Chief of Engineers, Department of the Army; the District Engineer, Corps of Engineers; the Administra- tor of the Environmental Protection Agency; and the Secretary of the Department of Interior.

eign immunity bars this action against the United States. In their memorandum, defendants submit that this suit is in effect a suit against the United States and that such a suit may not be maintained in the absence of an express waiver of sovereign immunity by the Congress. Despite defendants contentions to the contrary, such a waiver has been enacted by Congress. Section 505 of the FWPCA, 33 U.S.C. § 1365, expressly authorizes citizens' suits under the FWPCA. Title 33 U.S.C. § 1365(a), § 505(a) of the FWPCA, provides the following:

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

Section 1365(f), § 505(f) of the Act, provides in pertinent part the following:

(f) For purposes of this section, the term "effluent standard or limitation under this chapter" means (1) effective July 1, 1973, an unlawful act under subsection

(a) of section 1311 of this title [§ 301 of the Act] . . . or (6) a permit or condition thereof issued under section 1342 of this title [402 of the Act], which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title).

■ Clearly, § 505(a)(1) abolishes sovereign immunity for Count I, and § 505(a)(2) does likewise for Count II, assuming Count II seeks to require the Administrator of the EPA to perform a nondiscretionary act.[2]

## THE NOTICE ISSUE

Defendants submit that even if § 505(a)(1) and (a)(2) abolish sovereign immunity against this suit, inadequate notice was given under § 505(b), 33 U.S.C. § 1365(b) because not all of the plaintiffs were named in the notice and because the notice referred only to the Russell Dam project. It must be remembered that § 505(a) begins by stating: "Except as provided in subsection (b) of this section, any citizen may commence a civil action . . .." Subsection (b) provides the following:

### Notice

(b) No action may be commenced—

(1) under subsection (a)(1) of this section—

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

---

2. This issue will be discussed at length hereinbelow under the heading "THE SECTION 309 ISSUE (COUNT II)." Though the discussion under "Count II" seeks to resolve what is essentially a jurisdictional question, the analysis of that issue would best be handled after a full discussion of § 301 of the Act since a violation of that section is not only the basis of Count I, but is also a prerequisite to plaintiffs' claims under Count II.

(2) under subsection (a) (2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator,

except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

The question thus becomes whether or not subsection (b) is a jurisdictional prerequisite to this action, and, if so, whether plaintiffs have effectively complied with its provisions.

The Courts are not in agreement as to whether or not the notice requirements of § 505(b) rise to the status of a jurisdictional prerequisite to a FWPCA suit. In *Natural Resources Defense Council, Inc. v. Train,* 166 U.S.App.D.C. 312, 318–323, 510 F.2d 692, 698–703 (1975) (Robb, Circuit Judge, dissenting), and *Natural Resources, Defense Council v. Calloway,* 524 F.2d 79, 83–84 (2nd Cir. 1975), the District of Columbia and Second Circuits, respectively, held that § 505(b)'s notice requirements are not of jurisdictional necessity because jurisdiction of claimed violations under the FWPCA can be had under the general federal question statute, 28 U.S.C. § 1331. *Cf. City of Highland Park v. Train,* 519 F.2d 681, 693 (7th Cir. 1975), *cert. den,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976), and *Commonwealth of Massachusetts v. U.S. Veterans' Administration,* 541 F.2d 119 (1st Cir. 1976).

Plaintiffs urge this Court to adopt the view taken by the District of Columbia and Second Circuits. Thus, they contend that § 505 is not the sole jurisdictional basis for citizen enforcement of the FWPCA because jurisdiction can also be maintained under 28 U.S.C. § 1331, which plaintiffs have alleged as a jurisdictional basis in their complaint. The real basis for this argument is § 505(e) of the Act, 33 U.S.C. § 1365(e) which provides as follows:

(e) Nothing in this section shall restrict any right which any person (or class of persons) may have under any statute or common law to seek enforcement of any effluent standard or limitation or to seek any other relief (including relief against the Administrator or a State agency).

■ This Court does not agree with the position adopted by plaintiffs that this "saving clause" provides this Court with jurisdiction under § 1331. If a suit is brought under the provisions of the FWPCA, it must meet the requirements of that Act. This result is mandated by the very nature of § 505. As this Court has held, upon plaintiffs' urging, § 505 abolishes sovereign immunity against citizens' suits. It necessarily follows that this same waiver of immunity also provides the jurisdictional grant to this Court to entertain this suit because without the waiver, there would be no jurisdiction. Thus, since § 505 waives sovereign immunity, it must be strictly construed, and in light of § 505(a)'s reference to § 505(b) as being a prerequisite to a § 505(a) citizens' suit, it would be mandatory that plaintiffs substantially comply with the notice provisions of § 505(b). Finally, it would have been unnecessary for Congress to have passed § 505 if § 1331 had provided the relief sought. This Court will not presume that Congress performed an unnecessary act. Thus, this Court adopts the view that it is mandatory on plaintiffs to substantially comply with § 505(b) as a prerequisite to bringing suit under the FWPCA since they could not bring a suit under the Act without § 505(a), and 505(a) requires compliance with 505(b).

■ The question thus becomes whether or not plaintiffs have substantially complied. Defendants assert that substantial compliance has not been had because the notice that was served stated that it was served on behalf of "the National Wildlife Federation, its Georgia and South Carolina affiliates, and their representatives" and did not include any of the other plaintiffs. Thus, defendants submit that all of the plaintiffs have not met the 60 day notice requirement. This argument is unconvincing because such an omission would in no way fail to put the defendants on notice as

to the nature of the suit or the basis on which it was to be brought. Therefore, defendants have not been prejudiced by this omission, and this Court will not refuse to proceed with this matter on that basis.

■ The second objection by defendants as to the deficiency of the notice deserves closer scrutiny. The omission of Clark Hill and Hartwell as sources of violations would not provide defendants with notice sufficient to allow possible administrative resolution of the claims as to those projects. Plaintiffs' argument that defendants have not been prejudiced by these omissions because the filing of the suit in this court gave them actual notice simply begs the question. One of the major purposes of the notice provision is to allow for possible administrative resolution *prior* to filing suit. Since the notice is jurisdictional, such a significant omission divests this Court of the authority to further proceed with an adjudication of this matter as it relates to Hartwell and Clark Hill. The remainder of this opinion, therefore, will be addressed to plaintiffs' contentions as to Russell Dam only.

## THE SECTION 301 ISSUE (COUNT I)

In Count I, plaintiffs allege that defendants have violated § 301(a) of the Act, 33 U.S.C. § 1311(a), which reads as follows:

(a) Except as in compliance with this section and sections . . . 1342 . . of this title [§ 402 of the Act], the discharge of any pollutant by any person shall be unlawful.

Section 402(a)(1) of the Act, 33 U.S.C. § 1342(a)(1), reads as follows:

(a)(1) Except as provided in sections 1328 and 1344 of this title [§§ 318 and 404 of the Act], the Administrator may, after opportunity for public hearing, issue a permit for the discharge of any pollutant, or combination of pollutants, notwithstanding section 1311(a) of this title [§ 301(a) of the Act], upon condition that such discharge will meet either all applicable requirements under sections 1311, 1312, 1316, 1317, 1318, and 1343 of this title [§§ 301, 302, 306, 307, 308, and 403 of the Act], or prior to the taking of necessary implementing actions relating to all such requirements, such conditions as the Administrator determines are necessary to carry out the provisions of this chapter.

Plaintiffs contend that the releases from Russell Dam will involve the discharge of pollutants into the Savannah River in violation of § 301(a), unless a permit is obtained pursuant to § 402 of the Act. In order to determine whether a § 402 permit is required, a determination must be made as to whether or not the releases from the dam will involve "the *discharge* of any *pollutant* by any *person* . . . .."

Title 33 U.S.C. § 1362(5), § 502(5) of the Act, provides as follows:

(5) The term "person" means an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State, or any interstate body.

Section 1362(6), § 502(6) of the Act, defines "pollutant":

(6) The term "pollutant" means dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water. . . .

Section 1362(7), § 502(7) of the Act, states:

(7) The term "navigable waters" means the waters of the United States, including the territorial seas.

Section 1362(12), § 502(12), provides:

(12) The term "discharge of a pollutant" and the term "discharge of pollutants" each means (A) any addition of any pollutant to navigable waters from any point source . . . ..

Section 1362(14), § 502(14), provides:

(14) The term "point source" means any discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit,

well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture.

Thus in order for an act to be unlawful under § 301, it must involve (1) the *addition* of a *pollutant* into *navigable waters* (2) from a *point source* (3) by a *person.* The Court will analyze each of these requirements.

1. *An addition of a pollutant into navigable waters.*

Plaintiffs contend that the water to be released from the Russell Dam will be oxygen deficient and will contain high concentrations of metallic substances such as iron, manganese, phosphorus and mercury, making the water harmful to fish and other aquatic life. Plaintiffs contend that the cause of this change in the character of the water is the impoundment of the water in the reservoir. Accepting these contentions as true, as the Court must for purposes of a motion to dismiss, the question is whether or not the discharge of this impounded water constitutes the *addition* of a *pollutant* into *navigable waters.*

■ As defined by 33 U.S.C. § 1362(6) quoted above, the term "pollutant" means, *inter alia,* "chemical wastes." Waters that are characterized by high concentrations of metallic compounds and a low dissolved oxygen content cannot be held as a matter of law not to be "chemical wastes." The method used to obtain hydroelectric power is not unlike other production processes that entail the use of raw materials to produce a product and one or more by-products which are often chemical wastes, heat, and other pollutants. The raw material is life-sustaining water, the product is energy, and the by-product is non-life sustaining water characterized by a low dissolved oxygen content and high in dissolved metals. The process involved in a steam-electric power plant provides an analogous situation. These power plants create pollution in a manner very similar to hydroelectric facilities. The major "pollutant" discharged by steam plants is heat—a physical condition rather than a substance. By raising the temperature of the receiving water, the heated effluent of a steam plant may cause "thermal pollution." Similarly, by discharging oxygen-deficient water from the lower stratum of a reservoir, a hydroelectric facility may lower the dissolved oxygen content of the receiving water and thereby cause a form of pollution possibly as harmful as thermal pollution. Heat is clearly defined as a pollutant under § 502(6). There is no rational basis to treat water low in dissolved oxygen and high in metallic concentrations any differently. This is especially true in light of § 502(19) which defines pollution to mean "the man-made or man-induced alteration of the chemical, physical, biological, and radiological integrity of water." The process described by plaintiffs certainly meets that description and no reasonable purpose would be served by admitting pollution while denying the existence of a pollutant. Therefore, this Court cannot conclude, as a matter of law, that the facts, as presented by plaintiffs, do not indicate the potential discharge of a *pollutant.*

The question thus becomes whether or not the release of this water into the Savannah River will constitute an "addition" of a pollutant into navigable waters. Neither side in this action questions, and this Court holds, that the Savannah River is a navigable water. However, defendants strongly urge that there will be no "addition" of a pollutant into the Savannah River because nothing is added to the water in the reservoir. They contend that the lower dissolved oxygen content and higher metallic content would result from "a natural process occurring in a water body and would not be based upon activity of the defendants." According to plaintiffs' factual allegations, which this Court must accept as true, defendants' contention that the change in the water quality is a natural process not based upon defendants' activities is inaccurate. According to plaintiffs, the water that enters the reservoir will be high in dissolved

oxygen and low in metals. It is only by the impoundment of the water that these changes occur. This impoundment certainly is not a natural condition and will result solely from the operation of the dam for which defendants allegedly *are* responsible.

In support of their position, defendants cite *Appalachian Power Co. v. Train,* 545 F.2d 1351 (4th Cir. 1976), which states the following at p. 1377:

Industry next challenges EPA's chemical effluent limitations on the ground that the standards imposed are absolute and apply regardless of the pollutants in a plant's intake water. It is Industry's position that EPA has no jurisdiction under the Act to require removal of any pollutants which enter a plant through its intake stream. We agree.

Section 301(a) of the Act provides that "the discharge of any pollutant by any person shall be unlawful." In turn, § 502(12) defines the term "discharge of a pollutant" to mean "any addition of any pollutant to navigable waters from any point source. . . ." Thus, the Act prohibits only the addition of any pollutant to navigable waters from a point source. Those constituents occurring naturally in the waterways or occurring as a result of other industrial discharges, do not constitute an addition of pollutants by a plant through which they pass. . . . [footnotes omitted].

■ Defendants' reliance on *Appalachian Power* is misplaced. There, pollutants were present in the water before it entered the plant through its intake stream. The Court held that it was beyond the scope of EPA's authority to require industry "to treat and reduce pollutants other than those *added* by the plant process." *Id.* at 1377 (emphasis added). The present case would be similar *if* the water in the Savannah River were oxygen-deficient and contained high concentrations of metallic compounds *before* it entered the reservoir. But, accepting plaintiffs' factual allegations as true, this is *not* the case. In this case, high quality water—high in dissolved oxygen and low in metals—will enter the facility and low quality

water with added pollutants will be discharged. Thus, the release of the water as changed *because* of the impoundment constitutes the "addition" of pollutants into a navigable water. If unpolluted water entered the reservoir and was then held in the reservoir in a manner resulting in stagnation, and the water was then released back into the Savannah River, though defendants may not have added the first particle to the water in the reservoir, they would have unquestionably caused the addition of pollutants into a navigable water. The same argument applies to the present case. The difference is only a matter of degree. If defendants *cause* the character of the water to change from a life sustaining body when it is received in the reservoir to one incapable of properly supporting life when released, they will have *added* pollutants to a navigable water.

2. *From a point source.*

As noted previously, 33 U.S.C. § 1362(14), § 502(14) of the Act, defines point source to mean:

[A]ny discernible, confined and discrete conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged. This term does not include return flows from irrigated agriculture.

■ Plaintiffs contend that the water to be released from Russell will be discharged from four turbine units which are cylinder conveyances approximately 20 feet in diameter at the point of discharge. This Court, in the present posture of the case, cannot conclude that these are not "discernible, confined and discrete conveyances." In fact they might very well be properly characterized as "pipes," "tunnels" or "conduits." Defendants urge that EPA has the discretion and authority to determine which entities constitute point sources and nonpoint sources, and, because it has not defined dams as point sources, this Court cannot properly make such a determination

at this time. It must be remembered, however, that this Court is only stating, assuming plaintiffs' descriptions are accurate, that it cannot conclude as a matter of law that the dam and/or its turbines do not constitute point sources. But, it is the belief of this Court that if plaintiffs' proof at trial of this matter does bring the dam and/or its turbines under the definition of § 502(14), it would be of little if any consequence whether the Administrator has or has not made a similar conclusion. Though this Court, at this time, will not question the Administrator's authority to clarify what constitutes a point source or a nonpoint source,[3] it will, nevertheless, state its belief that if plaintiffs' proof clearly falls within the statute, the project will be held to be a point source, notwithstanding the Administrator's failure to arrive at a similar conclusion.

### 3. *By a person.*

Though defendants previously contested that federal agencies are "persons" under § 301, they have now conceded that federal agencies are indeed within the purview of § 301. Title 33 U.S.C. § 1323(a), § 313(a) of the Act, clearly so provides by stating in part the following:

> (a) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants and each officer, agent, or employee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any require-

ment whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law. . . .

### 4. *Conclusion as to § 301.*

Having determined that plaintiffs have adequately alleged a discharge of pollutants by a person, which is necessary to state a claim under § 301(a) for which relief can be granted, the Court is still confronted with an additional argument by defendants, advanced at the hearing of this cause. At that time, defendants urged that, assuming a violation of § 301, defendants are excepted from its sanctions because they have complied with the permit provisions of § 301 which exempt violations of § 301 upon the obtaining of all necessary permits enumerated in § 301. Section 301 requires compliance with § 402. However, defendants argued at the hearing that because of a 1977 amendment to the Act, in the form of § 404(r), 33 U.S.C. § 1344(r), if defendants comply with § 404, no permit is required under § 402. Thus, defendants contend that they have not violated § 301 because they have complied with § 404. Section 1344(r), § 404(r) of the Act, provides as follows:

> (r) The discharge of dredged or fill material as part of the construction of a Federal project specifically authorized by Congress, whether prior to or on or after December 27, 1977, *is not prohibited* by or otherwise *subject to regulation under* this section, or a State program approved under this section, or *section 1311(a)* [§ 301(a) of the Act] *or 1342* [§ 402 of the Act] of this title (except for effluent

---

**3.** See *Natural Resources Defense Council, Inc. v. Train,* 396 F.Supp. 1393 (D.D.C.1975), for one court's justification for the Administrator's authority.

standards or prohibitions under section 1317 of this title), if information on the effects of such discharge, including consideration of the guidelines developed under subsection (b)(1) of this section, is included in an environmental impact statement for such project pursuant to the National Environmental Policy Act of 1969 and such environmental impact statement has been submitted to Congress before the actual discharge of dredged or fill material in connection with the construction of such project and prior to either authorization of such project or an appropriation of funds for such construction. [Emphasis added]

■ This contention by defendants that § 404(r) exempts them from having to obtain a § 402 permit is misplaced. The section states that: "The discharge of dredged or fill material as part of the construction of a Federal project . . . is not prohibited or otherwise subject to regulation under . . . section 1311(a) [§ 301(a) of the Act] or 1342 [§ 402 of the Act] . . ." The discharge of water low in dissolved oxygen and high in metals from a *to be* operating facility is *not* "the discharge of *dredged* or *fill* material as part of the *construction* of a Federal project." Plaintiffs are attempting to stop the discharge of the water *to be released* upon the *completion* of Russell Dam. The discharge plaintiffs seek to stop has nothing to do with a discharge associated with the *construction* of a project or with *dredged* or *fill* material. Thus, the § 404(r) exemption from having to obtain a § 402 permit has no application to the facts of this case.[4]

For the foregoing reasons, defendants' motion to dismiss Count I of the complaint for failure to state a claim upon which relief can be granted must be denied.

## THE SECTION 309 ISSUE (COUNT II)

In Count II, plaintiffs seek to have this Court require the Administrator to issue an order or institute a civil action to ensure compliance by the Corps of Engineers with § 301 in connection with the potential operation of Russell Dam. In particular, they seek to have this Court direct the Administrator to take steps necessary to ensure that the Corps obtains a permit in accordance with § 402. The basis for the relief sought by plaintiffs is 33 U.S.C. § 1319(a)(3), § 309(a)(3) of the Act, which reads in pertinent part as follows:

Whenever on the basis of any information available to him the Administrator finds that any person is in violation of section 1311 [§ 301 of the Act] . . . ., he *shall* issue an order requiring such person to comply with such section or requirement, or he *shall* bring a civil action in accordance with subsection (b) of this section. [Emphasis added].

Subsection (b) provides in pertinent part the following:

(b) The Administrator is authorized to commence a civil action for appropriate relief, including a permanent or temporary injunction, for any violation for which he is authorized to issue a compliance order under subsection (a) of this section. . . .

Defendants submit that § 309 is not applicable to the instant case because there is no violation of § 301(a). This basis for the motion to dismiss Count II is rejected by this Court for the reasons set forth above under the discussion of § 301. It is also defendants' position that enforcement decisions of the Administrator are discretionary and not mandatory, and therefore this Court cannot compel the Administrator to file a civil action or to issue an order pursuant to § 309. Defendants point out that § 505(a)(2) provides that any citizen may commence a civil action against the Administrator but only "where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator." Thus, defendants contend that since the complaint does not allege a failure on the

4. Though plaintiffs originally sought to stop the construction of the Russell Dam on the basis that such *construction* would result in the discharge of dredged or fill material, they abandoned that ground upon defendants' compliance with § 404.

part of the Administrator to perform a non-discretionary act or duty, the complaint fails to state a claim upon which relief can be granted, and the Court lacks subject matter jurisdiction.

Plaintiffs counter by arguing that the Administrator has been made aware of the § 301 violation by defendants, and, since § 309 imposes a nondiscretionary duty on him, the Administrator must issue a compliance order or institute a civil action. The issue thus becomes whether or not § 309 is mandatory or discretionary.

Section 309(a)(3) states that whenever the Administrator "finds" a § 301 violation, he "shall" issue a compliance order, or he "shall" bring a civil action in accordance with § 309(b). The first issue to be determined is what "finds" means. The second is what "shall" means. Unfortunately, the simplicity of the questions is not characteristic of the answers.

Turning to the "finds" issue, defendants contend that a finding of a violation is discretionary with the Administrator and cannot be compelled by judicial process and that "finds" means that the Administrator must make a formal finding of a § 301 violation. Or, stated from a different perspective, "finds" does not mean merely that information or evidence of a § 301 violation has been brought to the Administrator's attention.

Plaintiffs, on the other hand, note that § 309(a)(3) provides that the Administrator's duty to issue a compliance order or file suit arises "[w]henever *on the basis of any information available to him* the Administrator finds that any person is in violation of" the Act. They submit that the Administrator has long been on notice that Russell Dam will discharge pollutants in violation of § 301. Plaintiffs also state that in accordance with § 505, 33 U.S.C. § 1365, they notified the Corps of Engineers and EPA, by letters dated January 29, 1976, of the violations of the Act and of plaintiffs' intention to sue to compel compliance. Moreover, they dispute defendants' contention that the Administrator is not under a present duty to issue a compliance order or

to file a civil action. Plaintiffs argue that defendants' position that the duty is predicated on a finding which cannot be judicially compelled is erroneous for two reasons: First, a formal finding of violation is not required, and second, even if it were required, a court could compel the Administrator to make a finding.

In support of their first contention, plaintiffs argue that because § 309(a)(3) invokes the Administrator's enforcement duties whenever the Administrator "finds" a violation "on the basis of any information available to him," the statute clearly indicates that the FWPCA requires the Administrator to act whenever he has been apprised of any information indicating that there is or may be a violation. In support of this position, plaintiffs cite *Illinois v. Hoffman,* 425 F.Supp. 71 (S.D.Ill.1977), and *United States v. Phelps Dodge Corp.,* 391 F.Supp. 1181 (D.Ariz.1975).

In *Hoffman,* the Court stated the following at p. 77:

> Whenever a violation is *directed to the attention of the Administrator,* he is directed either to issue an abatement order . . . or to institute a civil suit for enforcement. [Emphasis added].

The Court thus stated that the Administrator's enforcement duties can ripen without his having made a formal "finding" of violation.

In *Phelps Dodge,* the Court stated the following at p. 1183:

> The enforcement provisions of the FWPCA, Title 33, United States Code, Section 1319(a)(3) [§ 309(a)(3) of the Act], set forth two courses of action which are open to the Administrator *when he becomes aware of a violation of the Act.* He must either file a civil action against the person he believes to be a violator, or he must give such person an abatement order. [Emphasis added].

Thus, under *Hoffman* and *Phelps Dodge,* "whenever a violation is directed to the attention of the Administrator" or "when he becomes aware of a violation of the Act," the requirements for a "finding" of a violation under § 309 are met.

However, in a section-by-section analysis of the Conference Report of the bill which became the FWPCA, Senator Muskie, a prominent figure in the enactment of the FWPCA, offered these remarks:

It is expected, of course, that upon receipt of information giving the Administrator reason to believe that a violation has occurred, he has an affirmative duty to take the steps necessary to determine whether a violation has occurred, including such investigations as may be necessary, and to make his finding as expeditiously as practicable.

*A Legislative History of the Water Pollution Control Act Amendments of 1972,* Vol. 1, at p. 174. (Hereinafter referred to as *Leg.Hist.*).

■ Thus assuming arguendo that an express finding is required to activate the Administrator's enforcement duties, this Court can still compel the Administrator to make a finding, be it positive or negative. To hold otherwise would vitiate the enforcement scheme of the FWPCA, since the Administrator could otherwise totally avoid his enforcement duty by closing his eyes to violations and refusing to make any "finding" either way with respect to violations of the Act to which his attention is directed. For a case reaching this same result under the corresponding provisions of the Clean Air Act, see *Wisconsin's Environmental Decade, Inc. v. Wisconsin Power and Light Co.,* 395 F.Supp. 313 (W.D.Wis.1975). For a contra decision under that same Act, see *New Mexico Citizens for Clean Air and Water v. Train,* 6 E.R.C. 2061 (D.N.M.1974).

In light of the conclusions stated above and plaintiffs' contentions that the Administrator has been made aware of the alleged violations, this Court cannot hold as a matter of law that a finding by the Administrator has not been made. But even if an express finding by the Administrator is required, this Court could compel the Administrator to make a finding one way or the other. Based on that conclusion, it would be improper to dismiss plaintiffs' complaint at this juncture of the proceedings.

Having disposed of the "finding" question (at least for purposes of the present motion), the Court must now determine whether or not it is mandatory on the Administrator to issue a compliance order or file a civil action, once he "finds" a violation. As stated previously, that question turns on whether this Court interprets the word "shall" in § 309(a)(3) to mean "shall" or "may." At this point it would be useful to restate that the reason for making this determination is to find out whether the acts enunciated in § 309 are mandatory or discretionary which in turn will decide whether a citizens' suit properly lies for Count II since § 505(a)(2) allows a citizens' suit against the Administrator for his failure to perform acts which are *"not discretionary."* It would also be helpful to restate § 309(a)(3) which essentially provides that whenever the Administrator finds a violation of the Act (including a § 301 violation), "he *shall* issue an order requiring such person to comply with such section or requirement, or he *shall* bring a civil action . . . .."

■ Statutory language that an act "shall" be carried out is generally regarded as mandatory. *See, e. g., Anderson v. Yungkau,* 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436 (1947); *Boyden v. Commissioner of Patents,* 142 U.S.App.D.C. 351, 353, 441 F.2d 1041, 1043 (1971). As the Supreme Court said in *Escoe v. Zerbst,* 295 U.S. 490, 493, 55 S.Ct. 818, 820, 79 L.Ed. 1566 (1935), " 'shall' is the language of command." Though this rule of construction is not absolute, where the statute's purpose is the protection of public or private rights, as opposed to merely providing guidance for government officials, courts usually interpret "shall" as imposing mandatory rather than directory duties. *See, e. g., Escoe v. Zerbst, supra* at 494, 55 S.Ct. at 820 (statutes are "mandatory in meaning" when to put them in a directory category "would result in serious impairment of the public or the private interests that they were intended to protect"); *In re National Mills,* 133 F.2d 604, 607 (7th Cir. 1943) ("a provision in a statute designed for the protection of the public or third parties is usually construed as mandatory").

Since the apparent purpose of the Administrator's enforcement authority under Section 309 of the FWPCA is the protection of the public's interest in unpolluted waterways, the above-cited rules of construction support a conclusion that the word "shall" in Section 309 imposes a mandatory duty on the Administrator to act in one of the two ways prescribed in that section, unless the intent of the Congress is shown to be otherwise.[5]

The legislative history of § 309 indicates that even though the word "shall" imposes a nondiscretionary duty on the Administrator, that duty is limited to the issuance of compliance orders. The different versions of the water pollution control amendments in the House and Senate indicate some disagreement concerning the extent of the Administrator's duty to act.

The Conference Report explains this conflict and its resolution this way:

*Senate bill*

Section 309 requires the Administrator to provide notice to a polluter and the State upon discovering violation of any effluent limitation. The Administrator also is required to issue a compliance order or to bring a civil suit against the polluter.

\* \* \* \* \* \*

. . . [T]he section requires him to either issue an order that requires immediate compliance or to bring a civil suit. . . . If such an abatement order is not complied with, the Administrator would initiate a civil suit for appropriate relief, such as an injunction.

\* \* \* \* \* \*

*House amendment*

Section 309 is basically the same as the Senate bill except that the Administrator is authorized rather than required to initiate *civil actions* or criminal proceedings.

. . .

*Conference substitute*

This is the same as the House amendment.

*Leg.Hist.* at 314–315. [Emphasis added].

In opting for the House version, Congress kept the duty to *act* mandatory, and made discretionary only the Administrator's *method* of acting. That is to say, though Congress may have made it discretionary on the Administrator to institute suit, it seems clear that it still required him to issue appropriate compliance orders.[6]

The fact that the drafters of the Act consciously intended to impose a nondiscretionary duty on the Administrator is also apparent from a comparison of Section 309(a)(3) with the enforcement provision of the Clean Air Act, 42 U.S.C. § 7413. In drafting the enforcement provisions of the FWPCA, the Senate Committee on Public Works "drew extensively" on the Clean Air Act. *Leg.Hist.* at 1481.

One section of the enforcement provision of the Clean Air Act provides:

Whenever, on the basis of any information available to him, the Administrator finds that any person is in violation of . . . [specified sections of the Act], he *may* issue an order requiring such person to comply with such section or requirement, or he *may* bring a civil action in accordance with subsection (b) of this section. 42 U.S.C. § 7413(a)(3). [Emphasis supplied].

---

**5.** See *State Water Control Board v. Train,* 559 F.2d 921, 924–25 n. 20 (4th Cir. 1977), for authority that "available extrinsic interpretive aids may not be disregarded even though the statutory language appears to have a 'plain meaning' which does not lead to an absurd result."

**6.** This point was made by Senator Muskie in his section-by-section analysis of the Conference Report:

In section 309, the Senate receded to the House in not making civil enforcement mandatory upon the Administrator despite the

feeling of the Senate Conferees that, on its own merits, mandatory civil enforcement is far preferable to a discretionary responsibility. It is important to note, however, that the provisions requiring the Administrator to issue an abatement order whenever there is a violation were mandatory in both the Senate bill and the House amendment and the Conference agreement contemplates that *the Administrator's duty to issue an abatement order remains a mandatory one.* . . . *Leg. Hist.* at 174.

This provision varies in one key respect from Section 309(a)(3) of the FWPCA. Whereas the Clean Air Act provides that upon finding a violation, the Administrator *"may"* issue an abatement order or *"may"* bring a civil action, the corresponding provision of the FWPCA provides that he *"shall"* act in one of these two ways. Thus, this key difference in provisions which are otherwise very similar demonstrates beyond any doubt that Congress very deliberately intended to impose more under the FWPCA than just the discretionary duty which the Clean Air Act imposes on the Administrator. The duty intended to be imposed is a *mandatory* one.

There is a paucity of case law dealing with this issue, and those Courts that have been confronted with the question are not in agreement. Two of the cases, *Illinois v. Hoffman, supra,* and *United States v. Phelps Dodge Corp., supra,* hold that the word "shall" imposes a mandatory duty on the Administrator to act. A third, *Sierra Club v. Train,* 557 F.2d 485 (5th Cir. 1977), holds that § 309(a)(3) imposes a discretionary duty on the Administrator.

In *Hoffman,* the Administrator moved for summary judgment on the ground, *inter alia,* that under § 309, he has "discretion to enforce, or not enforce, the Act at his option." 425 F.Supp. at 76. In rejecting this argument, the Court stated the following (part of which has previously been quoted herein) at p. 77:

. . . The Act provides that the Administrator "shall" take appropriate enforcement action when a violation exists. 33 U.S.C. § 1319. *United States v. Phelps Dodge Corp.,* 391 F.Supp. 1181, 1182, 1185 (D.Ariz.1975), stands for the proposition that this provision is mandatory. Whenever a violation is directed to the attention of the Administrator, he is directed either to issue an abatement order, which is ultimately enforceable by a criminal prosecution, or to institute a civil suit for enforcement. . . .

The Act must be construed as mandating appropriate action by the Administrator, and a civil action will lie against the Administrator to compel him to act in a proper case.

The Court in *Phelps Dodge,* after reviewing the relevant legislative history, held as follows at p. 1184:

Thus, it seems clear that the bill as finally submitted and passed was intended to provide that while the Administrator *must* act in case of any violations, he has alternative methods of action; i. e., either by civil or by criminal proceedings.

. . .

Contrary to these decisions is *Sierra Club v. Train,* 557 F.2d 485 (5th Cir. 1977). There the Court plowed much of the same ground previously traversed by this Court, such as rules of statutory construction, legislative history, etc., but reached the result that § 309 imposes only a discretionary duty. That Court, however, did not take notice of the interpretation of Senator Muskie quoted above. It did, though, offer an additional theory as to why the duty is discretionary. The basis for that discussion is subsection (b) of § 309. It must be remembered that § 309(a)(3) provides that the Administrator, on finding a violation, "shall issue an order requiring such person to comply with such section or requirement, or he shall bring a *civil action in accordance with subsection (b) of this section."* [Emphasis added].

Subsection (b) provides in part that the "Administrator is *authorized* to commence a civil action for appropriate relief, . . . for any violation for which he is *authorized* to issue a compliance order under section (a) of this section." [Emphasis added].

In analyzing these sections, the Court stated the following:

A statute must be examined in light of the words and the structure of the act in order to determine the legislative intent and the true meaning of the statute. *Exxon Corp. v. Train,* 5 Cir. 1977, 554 F.2d 1310. Section 1319, especially subsection (b)'s statutory language "is authorized," clearly demonstrates the discretionary flavor of the statute.

Proper statutory construction requires more than linguistic examination and re-

view of the rules of statutory construction. The interpretation should be reasonable, and where the result of one interpretation is unreasonable, while the result of another interpretation is logical, the latter should prevail. C. Sands, Sutherland's Statutory Construction § 45.12 (4th ed. 1973); *see Rosado v. Wyman,* 397 U.S. 397, 414–15, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); *United States v. St. Regis Paper Co.,* 2 Cir. 1966, 355 F.2d 688.

Reason would dictate that the duties prescribed by § 1319(a)(3) be found discretionary. Since the Administrator *at his discretion* may bring suit, concluding the Administrator's duty to issue an abatement order to be mandatory would be unreasonable. For example, if the Administrator did issue an abatement order which was not complied with and the Administrator did not commence a suit for failure to comply, the empty gesture of issuing an abatement order would not foster the FWPCAA's goal of pollution elimination. The citizen's alternative would be to file a suit to enforce the FWPCAA effluent limitation standards, but this right exists in the absence of the issuance of a compliance order by the Administrator. The citizen possesses the same right under the FWPCAA with or without issuance of a compliance order to bring suit against and receive damages from an alleged pollutor. In the quest to eliminate pollution a compliance order by the Administrator is unnecessary. On the other hand, the issuance of orders which the Administrator does not intend to pursue in court would be an exercise in practical futility, undermining the prestige and the effectiveness of the EPA.

This Court, in all due deference to the Fifth Circuit, respectfully disagrees. In § 101(a)(1) of the Act, 33 U.S.C. § 1251(a)(1), Congress declared that "it is the national goal that the discharge of pollutants into the navigable waters be eliminated by 1985." Reason dictates that it would be inconsistent with this broad remedial purpose for this Court to hold, less than seven years from this target date, that the Administrator can ignore a violation once it is called to his attention.

It is true that "if the Administrator did issue an abatement order which was not complied with and the Administrator did not commence a suit for failure to comply, the empty gesture of issuing an abatement order would not foster the FWPCAA's goal of pollution elimination." But that statement only begs the question because if no abatement or compliance order were issued, even less would be done to "foster the FWPCAA's goal of pollution elimination." At least a compliance order could result in some cases of compliance without civil suit, whereas the failure by the Administrator to do anything would certainly not enhance the possibilities of compliance. Moreover, once a compliance order is issued, the Administrator is authorized to commence suit to enforce the order. Violators of the Act who receive a compliance order would be ill-advised to ignore it, given the authority of the Administrator to bring enforcement proceedings. If they ignore the order and no suit is filed, they have gambled and won. If suit is filed, they have lost the bet. At least by requiring the Administrator to issue the order, the intent of Congress to eliminate pollution is furthered because of the compliance that might occur by the threat of enforcement proceedings. If no compliance order is issued, the possibilities of voluntary compliance are nil. Unlike the Fifth Circuit, again with all due deference, this Court still adheres to the old adage that "a half loaf is better than no loaf at all."

In further support of this Court's conclusion that compliance orders are mandatory is the fact that subsection (b) states that the Administrator is "authorized" to commence a civil action for any violation for which he is "authorized" to issue a compliance order under subsection (a). This Court is of the opinion that the true meaning of subsection (b) is not that the acts of the Administrator are discretionary. Instead the more reasonable interpretation is that subsection (b)'s reference to subsection (a) for the authority to issue compliance orders simply means that the Administrator can-

not act unless he *"finds"* a violation of the Act. In other words, to say that he is "authorized" to issue a compliance order only when he "finds" a violation is not the same as saying he is not required to issue a compliance order upon finding a violation. This Court adopts the former as the proper interpretation of the Administrator's duties: to wit, he must at least issue a compliance order once he finds a violation.

Finally, in their reply brief, defendants submit that the recent case of *State Water Control Board v. Train, supra,* is dispositive of this issue. Unfortunately, not only for the defendants, but also this Court, it is not. The part of the case relied on by defendants reads as follows:

> Our holding in this case does not mean that, absent Congressional action, severe sanctions will inevitably be imposed on municipalities who, despite good faith efforts, are economically or physically unable to comply with the 1977 deadline. We fully expect that, in the exercise of its *prosecutorial discretion,* EPA will decline to bring *enforcement proceedings* against such municipalities. Furthermore, in cases where *enforcement proceedings* are brought, whether by *EPA* or by *private citizens,* the *courts* retain equitable discretion to determine whether and to what extent fines and injunctive sanctions should be imposed for violations brought about by good faith inability to comply with the deadline. In exercising such discretion, EPA and the district courts should, of course, consider the extent to which a community's inability to comply results from municipal profligacy.

Id. at 927–928. [Emphasis added and footnotes omitted].

It seems clear from underlined portions of the above-quoted passage that the discretion being referred to by the distinguished author of the opinion, Judge Donald Russell, is *prosecutorial* discretion, be it civil or criminal, not the duty to issue compliance orders by the Administrator. The opinion speaks of *enforcement proceedings* brought in the *courts* by the EPA or *private citizens* for *sanctions.* The issuances of compliance orders are not "enforcement proceedings," they cannot be issued by private citizens, they do not issue from the courts, and they do not, in and of themselves, allow for fines or injunctive sanctions. All of these matters are characteristic of civil or criminal lawsuits filed in court. Obviously, the prosecutorial discretion being referred to by Judge Russell is just that, discretion to prosecute violations, and it does not refer to the issuance of compliance orders by the Administrator.

In light of the foregoing discussion, this Court holds that § 309(a)(3) imposes a nondiscretionary duty on the Administrator to issue compliance orders once he "finds" a violation of the Act, even though this Court is not of the opinion that he is mandated to begin enforcement proceedings in the courts by initiating either a civil or criminal action. Since § 309(a)(3) does impose this mandatory duty on the Administrator, the requirement for the filing of a citizens' suit against the Administrator under § 505(a)(2) has been met. Thus, defendants' motion to dismiss Count II is denied.

## MISCELLANEOUS ISSUES

Defendants finally assert that this action is premature since the Russell Dam will not be completed until at least 1983. This Court's response to that position is simply to point to the Tellico Dam on the Little Tennessee River. That facility presently lies dormant because of the decision of the Supreme Court in *Tennessee Valley Authority v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117, 1978. In that case the Court enjoined the operation of the Tellico Dam to protect the "snail darter," designated by the Secretary of the Interior to be an "endangered species." This designation was made pursuant to the authority given to the Secretary by the Endangered Species Act passed by Congress in 1973. In spite of this designation and Congress' awareness of it, Congress continued to appropriate funds for the construction of the project without providing for an exception to the Endangered Species Act. Thus stands a multi-million dollar facility that cannot be utilized

for anything other than a monument to governmental bungling. The taxpayers of this country can ill afford to bear the expense of another such monument. Therefore, the issues presented by the present case should be determined as expeditiously as possible.

The other grounds for defendants' motion have been considered by this Court but have been found to be unpersuasive.

### ORDER

IT IS, THEREFORE, ORDERED that defendants' motion to dismiss Counts I and II of the complaint for lack of jurisdiction and/or for failure to state a claim upon which relief can be granted be and the same is hereby denied.

IT IS FURTHER ORDERED that the discovery period in this case be extended for 60 days from the date of this Order. The parties will have 30 days from the end of the discovery period to file whatever further motions they deem appropriate.

AND IT IS SO ORDERED.